**CHRYSLER CORPORATION,**
Plaintiff-Appellee,

v.

**TEXAS MOTOR VEHICLE COMMISSION, et al., Defendants-Appellants.**

No. 84–1651.

United States Court of Appeals,
Fifth Circuit.

March 28, 1985.

Rehearing and Rehearing En Banc
Denied April 24, 1985.

---

Jim Mattox, Atty. Gen., II. Clyde Farrell, Asst. Atty. Gen., Chief, Consumer Protection Div., Mary Keller, Austin, Tex., for defendants-appellants.

David Crump, Houston, Tex., for amicus—The Legal Foundation of America.

Thompson & Knight, Schuyler B. Marshall, IV, Stephen F. Fink, Dallas, Tex.,

David M. Kendall, Austin, Tex., for plaintiff-appellee.

Chilton Davis Varner, Griffin B. Bell, Atlanta, Ga., for amici—Motor Vehicle Mfrs. Assn. and Auto. Importers of America.

Before THORNBERRY, REAVLEY, and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

We review for constitutional sufficiency Texas' effort to encourage extrajudicial resolution of warranty-related disputes between the purchasers of new vehicles and automobile manufacturers. Chrysler Corporation persuaded the district court that Texas' "lemon law," which grants automobile purchasers certain additional administrative remedies against manufacturers, is unconstitutional. The district court held that the statute denies manufacturers due process because automobile dealers, whose interests are said to conflict with those of manufacturers, constitute a majority of the adjudicatory commission that resolves disputes under the lemon law. The district court also concluded that because decisions of the commission are binding on manufacturers but leave purchasers free to pursue their judicial remedies—a perceived discrimination in remedial advantage of automobile purchasers over manufacturers—

the law denies manufacturers equal protection. Finally, the district court rejected the argument that the lemon law is preempted by the Magnuson-Moss Warranty Act.

We agree that Magnuson-Moss does not preempt but are unconvinced that Texas has violated any constitutional right of automobile manufacturers in its effort to encourage extrajudicial resolution of warranty-related disputes and to mitigate the economic advantage of manufacturers in them. We affirm the district court's finding of no preemption and reverse its holding that the statute is unconstitutional.

I

In 1983 the Texas Legislature, joining twenty-nine other states, enacted its "lemon law," section 6.07 of the Texas Motor Vehicle Commission Code, TEX.REV.CIV. STAT.ANN. art. 4413(36), § 6.07 (Vernon 1976 & Supp.1985).[1] Section 6.07 provides new warranty remedies for automobile purchasers and offers them an administrative forum—a judicial proceeding before the Commission—in which to assert those remedies. The law simultaneously preserves for automobile purchasers all prior protections offered them under Texas law; that is, section 6.07 creates additional rights for consumers but takes none away. Because specifics of the statutory scheme are important to an understanding of Chrysler's constitutional challenges, we explain the operation of section 6.07 in some detail.[2]

---

**1.** Unless otherwise indicated all subsequent statutory citations are references to various sections within Article 4413(36), the Texas Motor Vehicle Commission Code.

**2.** The provisions of the text of § 6.07 that are pertinent to this appeal provide as follows:

> *Warranty Performance Obligations*
>
> (a) In addition to the other powers and duties provided for in this Act, the Commission shall cause manufacturers and distributors to perform the obligations imposed by this section....
>
> (b) If a new motor vehicle does not conform to all applicable manufacturer's or distributor's express warranties and the owner or the owner's designated agent reports the nonconformity to the manufacturer or distributor, its agent, or its authorized dealer during

the term of such express warranties or during the period of one year following the date of original delivery of the motor vehicle to an owner, whichever is the earlier date, the manufacturer or distributor shall make the repairs as are necessary to conform the vehicle to applicable express warranties, notwithstanding such repairs are made after the expiration of such term or such one-year period. This section does not in any way limit the remedies available to an owner under a new motor vehicle warranty that extends beyond the one-year period covered by this section.

> (c) If the manufacturer or distributor is unable to conform the motor vehicle to an applicable express warranty by repairing or correcting any defect or condition which substantially impairs the use and market value of the motor vehicle after a reasonable number

Section 6.07 is integrated into the Texas Motor Vehicle Commission Code, and accordingly, the provision has the principal effect of extending existing administrative enforcement powers of the Commission to enforce automobile warranty provisions.[3] Under section 6.07(e) the Commission, a body comprised of five licensed motor vehicle dealers and four consumers appointed by the governor for six-year terms, *see* § 2.03(a), is given authority to adjudicate disputes under the lemon law and to enforce its provisions.

Section 6.07 not only designates the Commission as an informal forum for the adjudication of warranty claims, but also extends the remedies of purchasers for breaches of warranty and establishes the conditions under which those remedies may be asserted. Subsection (b) provides that if a new motor vehicle does not conform to the applicable express warranties and the owner reports the nonconformity during the warranty period or within one year of the sale, whichever is earlier, the manufacturer must "make the repairs as are necessary to conform the vehicle to applicable express warranties, notwithstanding such repairs are made after the expiration of ... [the warranty term] or ... [the] one year period." Under section 6.07(c), if the manufacturer fails to remedy the warranty violation after a "reasonable number of attempts" and the violation "substantially impairs the use and market value" of the vehicle, the manufacturer must replace it with a comparable one or refund the purchaser his purchase price (less a reasonable allowance for use). The manufacturer's affirmative defenses are to show either (1) that the problem is the result of owner abuse, neglect or unauthorized modifica-

of attempts, the manufacturer or distributor shall replace the motor vehicle with a comparable motor vehicle or accept return of the vehicle from the owner and refund to the owner the full purchase price less a reasonable allowance for the owner's use of the vehicle.... In any hearing before the Commission under this section, a manufacturer or distributor may plead and prove as an affirmative defense to the remedies provided hereunder that (1) the nonconformity is the result of abuse, neglect, or unauthorized modifications or alterations of the motor vehicle; or (2) the nonconformity does not substantially impair the use or value of the motor vehicle.

(d) It shall be presumed that a reasonable number of attempts have been undertaken to conform a motor vehicle to the applicable express warranties if (1) the same nonconformity has been subject to repair four or more times by the manufacturer or distributor, its agent, or its authorized dealer, within the express warranty term or during the period of one year following the date of original delivery to an owner, whichever is the earlier date, but such nonconformity continues to exist; or (2) the vehicle is out of service for repair for a cumulative total of 30 or more days during such term or during such period, whichever is the earlier date....

(e) The provisions of Subchapter C of this Act [which confers upon the Commission the authority to conduct hearings] are applicable to this section, and the Commission shall adopt rules and conduct hearings for the enforcement and implementation of this section. The provisions of this section are not available to an owner in an action seeking a re-

fund or replacement based upon the alleged nonconformity of a motor vehicle to an express warranty applicable to the motor vehicles unless the owner has first exhausted the administrative remedies provided herein. The provisions of this section are available in an action against a manufacturer or distributor brought under Chapter 17, Business & Commerce Code, after the owner has exhausted the administrative provisions provided by this section. Any action brought under the provisions of this section shall be by trial de novo.

(f) This section does not limit the rights and remedies otherwise available to an owner under any other law.

3. The Commission has historically been primarily responsible for licensing and regulation of dealers, distributors and manufacturers of new motor vehicles in Texas. Even before enactment of the lemon law, however, the Commission enjoyed some responsibilities for enforcement of automobile warranties. Since 1971 section 5.02 of the Code has required manufacturers, distributors and their representatives to honor the contractual obligations contained in their written warranties. Upon complaint that such an obligation has not been honored, the Commission may hold an administrative hearing which may lead to license revocation, an order to repair or replace defective parts, and civil penalties of up to $1,000 per day for each day of noncompliance with Commission orders. *See* §§ 5.02(8) & (9), 3.04(h), 4.06, 6.01. As described in the text, the lemon law empowers the Commission to conduct such hearings to enforce its provisions as well. § 6.07(e).

tion; or (2) that the problem does not substantially impair the value of the car.

Section 6.07(d) creates presumptions that have earned the statute its designation as a "lemon law." Under the statute there is a presumption that a reasonable number of attempts have been made to repair the vehicle when (1) the same defect has been subject to repair four or more times within the express warranty term or during the first year of purchase (whichever is earlier) and the defect continues; or (2) the vehicle is out of service for repairs for a total of 30 or more days during that same period.

Any party losing before the Commission may appeal by filing a petition for review in the district court of Travis County. § 7.01. Under the standard for review in such appeals, the Commission's decision is upheld unless the action taken is found to be "invalid, arbitrary or unreasonable," *id.*, and in accordance with the general rules for judicial review of agency action provided in the Administrative Procedure and Texas Register Act, TEX.REV.CIV.STAT. ANN. art. 6252–13a (Vernon Supp.1985), the Commission's decision remains effective and fully enforceable while review is proceeding in the district court. *See* AP-TRA, § 19(b)(3). Texas law does provide one avenue for supersedeas in such administrative appeals, however, for the appealing party is entitled to petition the district court for a temporary injunction barring enforcement of the agency's decision pending review. *See generally* 2 TEX.JUR.3d *Administrative Law* § 77 (1979).

 Because section 6.07 adds but does not take away any warranty remedies otherwise provided by Texas law, the pur-chaser who institutes a proceeding before the Commission enjoys additional avenues of redress should he lose in that administrative forum. He may, of course, petition for review of the Commission's decision as described above, but he may also institute a de novo action in the state district court under the Deceptive Trade Practices Act, TEX.BUS. & COMM.CODE ANN. § 17.41 *et seq.* (Vernon Supp.1985). Under section 6.07(e), so long as the purchaser has exhausted his administrative remedies under the lemon law, he enjoys in his DTPA suit the benefits of the presumptions and remedies created by section 6.07, regardless of the outcome of his proceedings before the Commission, and is exempt from any application of collateral estoppel or related principles that might otherwise keep him from proceeding afresh under the DTPA.[4] This latter aspect of subdivision (e) is particularly important in the scheme created by the lemon law, for it encourages purchasers to use this extrajudicial forum for resolving warranty disputes by providing that its use is without prejudice and will add additional arrows to a purchaser's remedial quiver should he, nonetheless, file suit in district court.

## II

Chrysler argues first that dealers and manufacturers are so at economic odds that a Commission composed of a majority of automobile dealers cannot constitutionally adjudicate purchaser-manufacturer disputes under the lemon law. The argument is that dealers have sufficient financial interest in the outcome of those disputes that decisions by the Commission[5] under sec-

---

4. Texas law distinguishes between situations where an agency acts in an administrative capacity and situations where an agency acts in a judicial capacity and accords collateral estoppel effect in the latter situations. *Bryant v. L.H. Moore Canning Co.*, 509 S.W.2d 432, 434 (Tex. App.—Corpus Christi), *cert. denied,* 419 U.S. 845, 95 S.Ct. 79, 42 L.Ed.2d 74 (1974); *Railroad Commission v. Phillips,* 364 S.W.2d 408, 410–11 (Tex.App.—Austin 1963, no writ). *But see Champlin Exploration, Inc. v. Railroad Commission,* 627 S.W.2d 250, 253 (Tex.Civ.App.—Austin 1982, writ ref'd n.r.e.). We agree with Chrysler that in deciding disputes under the lemon law the Texas Motor Vehicle Commission acts in a judicial capacity.

5. As explained above, the Commission consists of five representatives of motor vehicle dealers who conduct business in the State of Texas, "no two of which are franchised to sell the motor vehicles manufactured or distributed by the same person or a subsidiary or affiliate of the same person," § 2.03(a) and "[f]our ... persons from the public who are not licensed hereunder and who do not have, except as consumers, interest in any business that manufacturers

tion 6.07 deny due process to the manufacturers. Chrysler relies on *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), and its progeny in the administrative context, *Gibson v. Berryhill*, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973).

–1–

Chrysler's due process argument rests on the assertedly antagonistic relationship between car manufacturers and their dealers in warranty disputes with consumers. Specifically, Chrysler explains that unless a warranty defect was caused by consumer abuse, a persisting problem is most likely the product of either a manufacturing flaw or the dealer's negligent failure to repair the vehicle correctly. For that reason dealers are often named as defendants in warranty suits along with the manufacturer on either a negligent repair or misrepresentation theory. Given this circumstance, Chrysler asserts, dealer members of the Commission will be unsympathetic to claims of manufacturers in lemon law hearings that the warranty problem is not manufacturing error but inept repair. Moreover, although it is apparently conceded that dealers are entitled to disclaim all warranties, Chrysler argues that since the dealers are ordinarily subject to liability in warranty disputes and since the lemon law operates as a remedy only against manufacturers, *see* § 6.07(e), dealers on the Commission will have an incentive to make the provision an attractive remedy for purchasers by being biased in their favor. The argument is that by encouraging purchasers to use section 6.07 the dealers will deflect potential liability they might face were the purchaser to pursue other remedies. Because the dealers will be thus inclined to favor purchasers in lemon law disputes, Chrysler argues that permitting the Commission to adjudicate these matters denies car manufacturers due process.

The district court agreed with Chrysler, observing that "the automobile dealers have the temptation of both a pecuniary and institutional interest in the decision-making process. The institutional interest [sic], distributes, or sells new motor vehicles."

is to make sure the manufacturers carry the burden of any warranty claims that may exist. The monetary interest is served by the manufacturer carrying the weight of costs in pleasing the owner."

–2–

*Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1926) (Taft, C.J.) is our benchmark: it "... violates the Fourteenth Amendment, and deprives a defendant in a criminal case of due process of law, to subject his liberty or property to the judgment of a court the judge of which has a direct, personal, substantial, pecuniary interest in reaching a conclusion against him in his case." *Id.* at 523, 47 S.Ct. at 441. The *Tumey* Court struck down as a denial of due process an ordinance of a village in Ohio under which the judge of certain liquor violations was paid only in cases resulting in a conviction. The Court adopted an objective test, not set by "... men of the highest honor and the greatest self-sacrifice ..." but that of whether the procedure "offer[s] a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true...." *Id.* at 532, 47 S.Ct. at 444.

The Court later applied *Tumey* to a mayor's court in a village which derived a substantial part of its income from fines and costs imposed in those proceedings, explaining that the fact that (in *Tumey*) "... the mayor ... shared directly in the fees and costs did not define the limits of the principle." *Ward v. Village of Monroeville*, 409 U.S. 57, 60, 93 S.Ct. 80, 83, 34 L.Ed.2d 267 (1972). The Court distinguished *Dugan v. Ohio*, 277 U.S. 61, 48 S.Ct. 439, 72 L.Ed. 784 (1928), as presenting too remote a relationship between judge and money in that the city in *Dugan* was governed by five commissioners, including a mayor, with a city manager exercising all executive functions. The *Ward* Court also rejected the suggestion that any constitutional infirmity in the mayor's

*Id.* Manufacturers are not represented.

court proceedings could be cured by an appellate right to a trial de novo.

In the same term as its decision in *Ward*, the Court ruled that Alabama's State Board of Optometry, whose membership was confined to private practitioners, could not judge complaints aimed at optometrists employed by a corporation. *Gibson v. Berryhill*, 411 U.S. 564, 578, 93 S.Ct. 1689, 1697, 36 L.Ed.2d 488 (1972). The due process violation stemmed from the circumstance that elimination of optometrists employed by corporations, nearly one half of the Board members' competitors, "would possibly redound to the personal benefit of members of the Board...." *Id.* at 578, 93 S.Ct. at 1698. The Court explained that its decision in *Ward* had made plain that "... the financial stake need not be as direct or positive as it appeared to be in *Tumey* ...." *Id.* at 579, 93 S.Ct. at 1698. Our own court recently surveyed the *Tumey* line in striking down Mississippi's fee system for its justice courts. *See Brown v. Vance*, 637 F.2d 272, 278–80 (5th Cir.1981).

–3–

We are not persuaded that car dealers have an economic stake in the resolution of warranty disputes between vehicle purchasers and manufacturers sufficient to constitute a violation of due process. Certainly the due process principle distilled from the *Tumey* line reaches beyond immediate economic stakes to include economic interests said to be "indirect" or "institutional." The principle is necessarily abstract. Immediacy of economic interest or related sources of bias are not measurable in more objective or more finite terms. Rather, the point at which on the continuum of interests from the directly paid judge who earns his keep from convictions, to a life-tenured and wholly disinterested justice, is by necessity both case-specific and ultimately judgmental, and presents the inevitable line-drawing for cases at the edge. Nonetheless, our own experience and intuition provide much practical assistance.

The predictors of bias here point in opposite directions. Perhaps the dealers on the Commission will be unsympathetic to manufacturers who contend that a claimed defect was only an inept repair effort by a dealer. Yet, we can equally speculate, if we are to speculate, that a dealer will be quick to find fault with his direct competitor—the dealer. Moreover, it is also possible that a dealer member of the Commission would tend to be biased in favor of manufacturers of his own make of car so that the brand he sells will not develop a reputation as a "lemon." To this mix Chrysler adds the suggestion that dealers have an incentive to encourage purchasers to take the administrative route, in which a dealer cannot be named as a defendant, to escape the district court suits where dealers are often joined as defendants along with the manufacturers. While plausible, the speculation ignores the partially mitigating circumstance that a dealer can be sued for negligence in repair whether or not the purchaser has pursued his warranty claim against the manufacturer. The suggestion of possible temptation here is not only overdrawn, but also ignores the fact that four of the nine members of the Commission are not dealers, a fact we believe relevant to the possible bias of the full decisionmaker—the Commission.

In short, in a system of peer review, with arbiters drawn from the same industry as the disputants, possibilities of improper motive can always be imagined. Where the speculations tumble against each other, however, we cannot find that the decisionmaker is impermissibly biased in the constitutional sense.

### III

Chrysler also argues that section 6.07 denies manufacturers due process and equal protection of the law by creating an adjudicatory framework in which "orders of the Commission are binding and in practice unappealable as to manufacturers but non-binding as to purchasers." Chrysler's argument actually has two distinct components. The first, partially overlapped by the second, is that the absence of automatic stay provisions pending review of Commis-

sion decisions under the lemon law exposes a losing manufacturer to substantial fines and possible loss of license should it not obey a Commission order pending its "appeal," and that this inadequate opportunity to obtain appellate review is both a differential treatment of purchasers and manufacturers and, relatedly, a distinct denial of procedural and substantive due process. The second argument reduces to a contention that the equal protection and due process clauses of the Fourteenth Amendment prohibit Texas from allowing a purchaser to pursue a plenary suit in a state district court after failing in his administrative claim before the Commission.

–1–

The asserted flaw in the procedure for review of Commission decisions in section 6.07 disputes is in part the product of the Administrative Procedure and Texas Register Act, TEX.REV.CIV.STAT. art. 6252–13a (Vernon Supp.1985). The Act supplements the provisions of particular statutes that provide for review of administrative decisions by state agencies. Section 19(b)(3) of the Act provides that where, as here, the review procedures in district court are not de novo but instead proceed under an "invalid, arbitrary or unreasonable" standard, enforcement of the agency's decision is not stayed pending appeal. Chrysler complains that because the Commission is empowered by the Texas Motor Vehicle Code to enforce its orders with suspension of the manufacturer's license and fines of up to $1,000.00 per day, *see* *supra* n. 3, the effect of the Act in lemon law disputes is to require a losing manufacturer to carry out the orders of the Commission before review. The harm in such enforcement, Chrysler argues, is that as a practical matter a manufacturer who prevails on appeal may not be able to recoup what he paid the complaining purchaser. The argument is essentially that the absence of supersedeas in the administrative appeal renders its process fatally defective.

■ Finding Chrysler's description of its appeal rights to be inaccurate, we need not reach the dubious proposition that due pro-

cess requires a procedure for the appeal of Commission decisions. As in nearly all administrative appeals under Texas law, supersedeas is available in the form of a petition for temporary injunction to restrain enforcement of the Commission's decision pending review. *See, e.g., Big Three Industries, Inc. v. Railroad Commission,* 618 S.W.2d 543 (Tex.1981); *Railroad Commission v. Shell Oil Co.,* 146 Tex. 286, 206 S.W.2d 235 (1947). *See generally* 2 TEX. JUR.3d *Administrative Law* § 77 (1979). An identical procedure is used in review of orders of the Texas Public Utility Commission, the Texas Board of Insurance and the Texas Railroad Commission, among others, agencies whose rulings may involve millions of dollars and have great impact upon the consuming public as well as utilities, producers, and other manufacturers. To be sure, Texas could have opted for a more traditional appellate scheme for its administrative agencies, where the stay of the agency order follows the path of supersedeas, but there is nothing to suggest that the chosen scheme has worked hardships upon litigants. Should a state district court refuse a requested order restraining implementation of an agency order, that denial is itself appealable. *See* TEX.REV. CIV.STAT.ANN. art. 2251 (Vernon 1971) (interlocutory appeals are allowed from denials of temporary injunction). Specifically, there is no suggestion that the Texas system *in operation* has failed to provide all the protection Chrysler suggests is here absent.

The lemon law's adoption of the skeleton of the administrative review process carries with it the flesh of that process as well. We thus reject Chrysler's argument that the procedures for a manufacturer's appeal of a Commission decision deliver less than the process due. We turn to the equal protection argument that the lemon law impermissibly distinguishes between the "appellate" rights given purchasers and those given to manufacturers.

–2–

Chrysler's central argument is that Texas cannot constitutionally refuse to attach

prejudice to a decision by the Commission adverse to the purchaser should he later bring a plenary suit in district court. As we explained, section 6.07 gives purchasers and manufacturers identical rights to obtain review of Commission decisions in the district court of Travis County. Yet a purchaser may lack incentive to petition for such limited review when he may freely pursue essentially identical rights, plus others, in a plenary suit in district court under the DTPA. In the broadest sense of "appellate review", it is then not inaccurate to say that purchaser and manufacturer are accorded different rights. Regardless of its characterization, the difference reduces to the refusal of the state to attach prejudice to the purchaser's pursuit of administrative remedies under the lemon law, *see supra* n. 4, and it is to this refusal that we now turn.

■ When legislation classifies, as it almost inevitably does, it must accommodate the egalitarian command that similarly situated persons be similarly treated. Equal protection issues then, at some level of generality, require adjustments of this tension. The adjusting techniques are well established, if crude: we must identify the standard to gauge the classification, then explore the state's interests in making the choices it has made and assess those choices under the applicable standard.

–a–

Chrysler suggests a heightened standard of review, greater than whether the classification and state objectives are rationally related, contending that in matters of process such review is warranted. It also argues that heightened review is appropriate because the lemon law's classification of purchasers and manufacturers adjusts procedures, affects protected access to courts, and employs a near-suspect criterion, wealth.

■ We are not persuaded that Texas's well-nigh unreviewable range of power to legislatively classify in matters of economics stops when its means of regulation include the adjustments of judicial proce-dures. Chrysler, pointing to Justice Harlan's concurring opinion in *In re Gault*, 387 U.S. 1, 70–71, 87 S.Ct. 1428, 1466, 18 L.Ed.2d 527 (1967), *Lindsey v. Normet*, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972), and *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 438–42, 102 S.Ct. 1148, 1159–61, 71 L.Ed.2d 265 (1982) (Blackmun, J., concurring), urges that while economic concerns may be peculiarly legislative business, process is peculiarly judicial business. The contention is an undisguised reach for a more intensive judicial review than that appropriate for economic regulation. *See Williamson v. Lee Optical*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

■ Resting as it does on categorization, procedural versus economic regulation, the argument is simplistic. The judiciary cannot justify intrusion into the weighing of economic objectives and values with the single assertion that the regulatory effort has affected "procedural rights." That is not to say that we here quarrel with the abstract proposition that *procedural* due process is more the business of courts than a *substantive* due process concern with classifications incident to state legislative efforts to achieve economic goals. The difficulty is that in terms of the deference to be accorded legislative decisionmaking, economic decisions regarding substantive entitlement, state regulation, and attainment of economic goals can be expressed, and often are expressed, in procedural terms. Placement and definitions of burdens of proof, and rules of repose, are familiar adjusting valves for state classification and entitlements drawn to achieve state regulatory goals. By necessity, then, how the procedures define the substantive decisions is an early, and certainly not the ultimate, inquiry. A state legislature entitled to deference in its regulatory scheme sufficient to license sales of a product or set standards for its quality, a fortiori can express its economic choices and attempt to achieve them with procedural tools such as placing the burden of proof and laying procedural hurdles. *Cf. Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40

L.Ed.2d 15 (1974); *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

Nor are we disposed to *ex cathedra* additions upon the suspect or fundamental list. Despite the open-ended language of the equal protection clause, constitutional protections of classes must have their genesis in the equal protection clause supportable by relevant constitutional text, history and structural inference. They must be more than the offspring of the detached analogical process of legal reasoning. That is, the inquiry is not the relationship of one assumed disadvantaging status to another measurable by logic and analogy, such as race to alienage to legitimacy to gender to poverty. The Court rejected such an approach in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (education to speech to voting). Rather, the inquiry is whether the affected interest or class criterion should enjoy that judicial protection necessary to vindicate the equal protection doctrine as drawn from constitutional text and history. Put more directly, the common law reasoning process, alone and untethered to text, will not do in constitutional decisionmaking. Despite the necessary generality of its expression, our approach is sufficiently specific to retain our constitutional mooring; to do otherwise cuts us adrift—and with little but subjective judicial dead-reckoning to guide. It follows that the equal protection clause is not a surrogate for the intensive substantive due process review undertaken in the *Lochner* line of cases and that a fundamental interest or suspect criterion must rest on textually-footed principles rather than judges' views of the importance of the implicated interest. *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Our "... standard is true to the principle that the Fourteenth Amendment gives the federal courts no power to impose upon the states their views of what constitutes wise economic or social policy...." *Id.* at 486, 90 S.Ct. at 1162. *See also San Antonio Independent School District v. Rodriguez*, 411

U.S. 1, 30–31, 93 S.Ct. 1278, 1295, 36 L.Ed.2d 16 (1973), *citing Shapiro v. Thompson*, 394 U.S. 618, 655, 661, 89 S.Ct. 1322, 1342, 1345, 22 L.Ed.2d 600 (1969) (Harlan, J., dissenting).

–b–

The challenged provisions of the lemon law are rationally related to valid objectives of the State of Texas. Without section 6.07, a purchaser of a new car could sue under the Texas Deceptive Trade Practice Act and also assert claims of breach of express warranty and negligence. There is no suggestion that these "traditional" remedies were other than procedurally adequate. Texas argues, however, that the state was entitled to recognize that this ostensibly even-handed system was in actual fact something else, at least in its ability to respond fairly to the limited class of claimants then its concern—persons who had purchased new cars with seemingly intractable problems—and that it was entitled to deal as a class with these litigants and deal with the reality that the manufacturer, with its resources for litigation, enjoyed a distinct advantage. We agree. There is nothing *procedurally* unfair about allowing a car purchaser a second shot at a manufacturer. Its effect is to enhance the claimant's chances of winning, but only because he can first attempt to persuade the Commission of his case. Failing in this concededly more expeditious and limited claim route, where a manufacturer faces much less exposure and a successful purchaser's claims will likely end, the purchaser is back to where he was before the lemon law—free to pursue his suit as long as his purse and his patience endure.

We find curious Chrysler's reliance upon *Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963), for the proposition that financial status is not a rational basis for the state to deny or burden access to adjudicatory processes. While accurate, the proposition is no more than a specific application of the equal protection command that similarly situated

persons be treated similarly, and the Texas lemon law reflects a determination by the legislature that automobile purchasers and manufacturers are not similarly situated in warranty-related disputes. That is, *Douglas* and other Supreme Court cases recognize a duty of government to equalize access to the courts by assisting the poor, *see, e.g., Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), and Texas has here attempted to balance the economic interests of litigants who otherwise might be unevenly matched.

■ Chrysler argues that its advantages are no greater than in all cases where litigants have widely different financial resources and that procedures ought not be adjusted to even that score. Of course, wealth is not a suspect criterion, *see San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), but wealth was not necessarily the index of the accused classification. Apart from what we have already said about procedure and substance, the legislature was here responding to more than the relative length of the parties' purses. It was also, as it was entitled to do, recognizing the distinct economic stakes of the parties. The legislature could permissibly assume that a car purchaser has little economic incentive to risk more than the value of his purchase to protect it. A manufacturer, on the other hand, has distinct economic concerns, including product image and reputation for toughness in its litigation posture, and accordingly its interests in warranty suits are plainly greater than its immediate exposure, or at least the legislature was entitled to conclude. Indeed, much of tort law rests on such economic adjustments and legislative assumptions about economic incentives and allocative efficiencies. If a state can create liability without fault as an exercise of its power to regulate matters of economic interests, that it can increase the chances of a claimant in a fault-based system necessarily follows.

Moreover, the advantages enjoyed by a purchaser who pursues his remedies under the lemon law before filing suit in district court under other warranty or contract theories are plainly an attempt by the state to encourage the use of the extrajudicial forum created by section 6.07 for the resolution of these disputes. The legislature was entitled to conclude that a purchaser might be disinclined to proceed in the administrative forum available to him under the lemon law were he to face in a subsequent suit procedural bars, such as collateral estoppel or related principles, by virtue of having first utilized his remedies under section 6.07. Accordingly, the legislature was entitled to increase the likelihood that its administrative forum would be used to resolve warranty-related disputes by declaring that prejudice would not attach to its use.

There is seldom a true empirical basis for demonstrating the rationality of such legislative decisions, decisions which themselves usually assumed, in a near aggregation of intuitive calls, the subsidiary arrays of data essential to a demonstrated rationality of the choice made. But this real view of the legislative process does not argue against a standard of rational review, but rather justifies the deference due the legislative process because judges cannot escape review of policy when they make their own assumptions.

In sum, we find no reason to review the lemon law by a greater standard than whether Texas' classification is rationally related to its concededly valid ends. The classifications chosen are at least rationally related to its objectives, and for that reason we reject Chrysler's equal protection arguments. *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).

### IV

Finally, Chrysler defends the judgment below on a ground rejected by the district court: that the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, preempts section 6.07. Like the district court, we are unpersuaded by Chrysler's arguments that federal law occupies the field of informal settlement mechanisms for warranty dis-

putes or that federal law either expressly or impliedly preempts the remedies and procedures created by section 6.07.

–1–

The Magnuson-Moss Warranty Act prescribes disclosure and designation standards for written warranties, 15 U.S.C. §§ 2302, 2303, defines federal content standards for "full" warranties, 15 U.S.C. § 2304, restricts disclaimers on implied warranties, 15 U.S.C. § 2308, and establishes consumer remedies for breach of warranty or service contract obligations, 15 U.S.C. § 2310(d). *See Boelens v. Redman Homes, Inc.*, 748 F.2d 1058, 1061–62 (5th Cir.1984) (explaining purpose and general operation of the Act's provisions). In addition to the goal of these provisions of making warranties on consumer products more readily understood and enforceable, Congress has in section 110 of Magnuson-Moss advanced a policy of encouraging warrantors to establish their own informal dispute settlement mechanisms wherein consumer complaints can be fairly and expeditiously resolved. Specifically, section 110(a)(3) authorizes warrantors to create informal dispute resolution procedures for which the

Federal Trade Commission has promulgated minimum standards. *See* 16 C.F.R. § 703 *et seq.* If a warrantor's procedure meets these standards he may require the consumer to resort to that forum before filing a civil action on his warranty under section 110(d) of Magnuson-Moss. The FTC is authorized to review a warrantor's dispute resolution procedure to insure that it meets federal standards, and should it fail to comply the FTC "may take appropriate remedial action under any authority it may have under [Magnuson-Moss] or any other provision of law." [6]

Chrysler's arguments for preemption are based on alleged conflicts between section 110 of Magnuson-Moss and the informal dispute resolution procedures created by the lemon law. Chrysler points out that the right to proceed before the Commission under section 6.07 is deemed "read into" all automobile warranties under Texas law and that a section 6.07 proceeding does not conform strictly to the FTC standards for informal settlement mechanisms under Magnuson-Moss. *See* 16 C.F.R. § 703 *et seq.* Chrysler urges that the provision in Magnuson-Moss that preserves for consum-

---

**6.** The pertinent portions of § 110 provide as follows:

(a)(1) Congress hereby declares it to be its policy to encourage warrantors to establish procedures whereby consumer disputes are fairly and expeditiously settled through informal dispute settlement mechanisms.

(2) The Commission shall prescribe rules setting forth minimum requirements for any informal dispute settlement procedure which is incorporated into the terms of a written warranty to which any provision of this chapter applies. Such rules shall provide for participation in such procedure by independent or governmental entities.

(3) One or more warrantors may establish an informal dispute settlement procedure which meets the requirements of the Commission's rules under paragraph (2). If—

(A) a warrantor establishes such a procedure,

(B) such procedure, and its implementation, meets the requirements of such rules, and

(C) he incorporates in a written warranty a requirement that the consumer resort to such procedure before pursuing any legal remedy under this section respecting such warranty,

then (i) the consumer may not commence a civil action (other than a class action) under subsection (d) of this section unless he initially resorts to such procedure.... In any civil action arising out of a warranty obligation and relating to a matter considered in such a procedure, any decision in such procedure shall be admissible in evidence.

(4) The Commission on its own initiative may, or upon written complaint filed by any interested person shall, review the bona fide operation of any dispute settlement procedure resort to which is stated in a written warranty to be a prerequisite to pursuing a legal remedy under this section. If the Commission finds that such procedure or its implementation fails to comply with the requirements of the rules under paragraph (2), the Commission may take appropriate remedial action under any authority it may have under this chapter or any other provision of law.

(5) Until rules under paragraph (2) take effect, this subsection shall not affect the validity of any informal dispute settlement procedure respecting consumer warranties, but in any action under subsection (d) of this section, the court may invalidate any such procedure if it finds that such procedure is unfair.

15 U.S.C. § 2310(a).

ers any rights or remedies provided by state law [7] is here inapplicable because the lemon law creates a dispute resolution *procedure* rather than substantive rights or remedies. That is, Chrysler concedes that Magnuson-Moss would not prohibit a consumer from bringing a warranty claim in state court under state law simply because his warrantor had established an informal dispute settlement mechanism, but urges that the preemptive effect of Magnuson-Moss on the procedures created by the lemon law derives from the failure of section 6.07 to comply with the federal minimum standards for informal dispute resolution mechanisms incorporated into written warranties.

–2–

■■■■ The rules applicable to such preemption claims are well-settled. In the absence of express definition by Congress of the extent to which it intends to preempt state law, courts may find state law preempted in one of two general ways. First, Congress may evidence an intent to occupy the entire field of regulation, in which case all regulatory activity will be the exclusive province of the federal government. *See, e.g., Fidelity Federal Savings & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982); *State of Texas v. United States,* 730 F.2d 339, 347 (5th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 267, 83 L.Ed.2d 203 (1984). If Congress has not entirely displaced state regulation over the matter in question, it may nevertheless preempt state law to the extent that state regulation actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, *see, e.g., Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963); *Commerce Park at DFW Freeport v. Mardian Construction Co.,* 729 F.2d 334, 339–40 (5th Cir.1984), or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress. *See, e.g., Michigan*

*Canners and Freezers Association, Inc. v. Agricultural Marketing and Bargaining Board,* — U.S. —, —, 104 S.Ct. 2518, 2527–28, 81 L.Ed.2d 399 (1984). Chrysler argues that section 6.07 is invalid under either analysis.

–a–

■■■■ Chrysler first suggests that the informal dispute resolution mechanisms authorized in section 110 of Magnuson-Moss and the regulations establishing federal minimum standards for their structure and operation, *see* 16 C.F.R. § 703 *et seq.,* reflect Congressional intent to occupy the field into which Texas has attempted to inject the dispute resolution procedures created by section 6.07. We disagree. Consumer protection through warranty law is an area that has traditionally been regulated by states through the common law and the Uniform Commercial Code; it was not until 1975 that Congress entered the fray with passage of Magnuson-Moss pursuant to its power under the Commerce Clause, U.S. CONST. Art. I § 8. These circumstances significantly affect our analysis of Chrysler's preemption claims, for when federal law operates in an area historically regulated by states, courts have required a "clear statement" by Congress of an intent to preempt. *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977); *State of Texas v. United States,* 730 F.2d at 347; L. Tribe, *American Constitutional Law* § 6.25 (1978). Cognizant of this presumption favoring the validity of state law, we have eschewed interpretations of Magnuson-Moss "that would significantly affect the federal-state balance." *See Boelens v. Redman Homes, Inc.,* 748 F.2d 1058, 1067–68 (5th Cir.1984) (holding that Magnuson-Moss does not create a federal cause of action for personal injury damages based solely on breach of warranty).

Here we find no clear statement either in the express language of section 110 or in its legislative history of any intention by

**7.** "Nothing in this chapter shall invalidate or restrict any right or remedy of any consumer under State law or any other Federal law." 15 U.S.C. § 2311(b)(1).

Congress to occupy the field of informal settlement mechanisms for warranty disputes. To the contrary, we find substantial indications that state-created avenues of relief such as those offered by the lemon law are not preempted by Magnuson-Moss. As noted above, section 111 of Magnuson-Moss preserves for consumers any rights or remedies created by state law. 15 U.S.C. § 2311(b)(1), quoted *supra* at n. 7. We do not agree with Chrysler's suggestion that the rights and remedies saved by that provision encompass only substantive rights and remedies and not procedures such as those authorized by section 6.07. The obvious intent of section 111 was to preserve alternative avenues of redress authorized by state law for the resolution of warranty disputes, and, absent statutory language or legislative history to support such a distinction, we are loath to restrict that intent to only those state remedies that are in some sense more substantive than procedural. As discussed *supra* in section III, there are numerous permissible avenues, both substantive and procedural, by which the state may choose to afford consumers relief. We think it plain that the preclusive effect of section 110 is limited to rules governing informal dispute resolution procedures created by private warrantors and does not affect such schemes where provided as an option for consumers by state law.

–b–

Our remaining inquiry is whether the procedures created by section 6.07 conflict directly with those authorized by section 110 or whether, as a practical matter, they interfere with the attainment of the full purposes and objectives of Congress in enacting section 110. We conclude that neither test for preemption is met.

The provisions of the lemon law are not mandatory; a consumer is not precluded from using his administrative remedy before the Texas Motor Vehicle Commission by virtue of having sought relief from his manufacturer in an informal forum created under the auspices of section 110 of Magnuson-Moss. Where available, both remedies, either, or neither may be pursued by the consumer. Because compliance with both provisions is not a literal impossibility, the requisite conflict between state and federal law to merit a finding of preemption is lacking. *Compare Commerce Park at DFW Freeport v. Mardian Construction Co.*, 729 F.2d 334, 339–40 (5th Cir.1984) (state law preempted where compliance with both state and federal law was "physically impossible").

Nor does the lemon law sufficiently conflict with the objectives underlying section 110 of Magnuson-Moss to warrant preemption. Chrysler urges that we should hold section 6.07 preempted because it unduly interferes with the intended purpose of section 110 of fostering private dispute resolution. Specifically, Chrysler suggests that consumers will inevitably prefer the informal procedures offered by the lemon law and will disdain similar forums offered by manufacturers pursuant to section 110. In addition, Chrysler argues, manufacturers will be reluctant to offer their own procedures since the likely effect will be that they will then face the prospect of duplicative proceedings in two pre-litigation forums.

We are not persuaded that the availability of relief from the Texas Motor Vehicle Commission under the lemon law will have so drastic an effect on the goals of Magnuson-Moss as Chrysler suggests. There are many reasons a consumer might prefer the informal proceedings offered by his manufacturer at no charge under section 110 to the state-run proceeding under section 6.07 in which a hearing is conducted and the rules of evidence apply. Chrysler has not demonstrated that section 6.07 presents any significant obstacle to the proper functioning of alternative private mediation systems under section 110 of Magnuson-Moss, and accordingly we hold that section 6.07 is not preempted by federal law. *Compare Michigan Canners and Freezers Association, Inc. v. Agricultural Marketing and Bargaining Board,* — U.S. —, 104 S.Ct. 2518, 2527–28, 81 L.Ed.2d 399 (1984) (pre-

emption found where state law encouraged conduct that federal law forbade).

## V

We conclude that Chrysler's challenges to the Texas lemon law ought to be directed to the legislature rather than the courts. The statute violates no constitutional rights of automobile manufacturers and is not preempted by federal law.

AFFIRMED IN PART AND RE-VERSED IN PART.