**MOTOR VEHICLE MANUFACTURERS ASSOCIATION OF the UNITED STATES, INC. and Automobile Importers of America, Inc., Plaintiffs,**

v.

**Robert ABRAMS, Attorney General of the State of New York, Defendant.**

No. 86 CIV 9592 (LBS).

United States District Court,
S.D. New York.

Oct. 13, 1988.

As Amended Oct. 28, 1988.

Hughes Hubbard & Reed, New York City and Philip A. Lacovara, William R. Stein, Edward J. Rubenstein, Washington, D.C., for plaintiffs.

William H. Crabtree, Detroit, Mich., for Motor Vehicle Mfrs. Ass'n of the U.S., Inc.

Charles H. Lockwood, II, Detroit, Mich., John T. Whatley, for Auto. Importers of America, Inc.

Robert Abrams, Atty. Gen. of State of N.Y., New York City, John W. Corwin, Jane M. Azia, Sara Nathan, Mary Hilgeman, Asst. Attys. Gen., for defendant.

## OPINION

SAND, District Judge.

### STATEMENT OF FACTS

The Motor Vehicles Manufacturers Association and the Automobile Importers of America here challenge several provisions of the New York State "Lemon Law", N.Y. General Business Law ("G.B.L.") § 198–a (McKinney 1988), alleging that under the Supremacy Clause they are pre-empted by the Magnuson–Moss Warranty—Federal Trade Commission Improvement Act, §§ 101 *et seq.*, codified at 15 U.S.C. §§ 2301 *et seq.* (1982), and the regulations promulgated thereunder by the Federal Trade Commission ("F.T.C." or "Commission"), at 16 C.F.R. § 703 (1988). The matter is before us on a motion for partial summary judgment brought by the Plaintiffs and a

motion to dismiss brought by the Defendant Attorney General.

The Lemon Law was originally enacted in 1983 (Ch. 444, L.1983), and was amended in 1986 (Ch. 799, L.1986) to include provisions regulating dispute resolution mechanisms voluntarily established by automobile manufacturers. It is these amendments that are at issue here. We have previously determined in this same case that a 1987 amendment to the Lemon Law was invalid under the First and Fourteenth Amendments as a prior restraint on speech. *See* 684 F.Supp. 804 (S.D.N.Y.1988). Pending further submissions from the parties, we do not here decide the Plaintiffs' challenge under the Commerce Clause to still other provisions of the Lemon Law.

■ Neither the Lemon Law nor the Magnuson–Moss Act purports to require manufacturers to establish dispute resolution mechanisms. Rather, they both require a manufacturer who chooses to establish a mechanism to ensure that the mechanism meets certain criteria.

■ A mechanism that fails to comply with the Lemon Law would be unlawful in New York. G.B.L. § 198–a(g). If a mechanism fails to meet the federal standards, however, it is not unlawful under federal law. A mechanism that fails to comply with Magnuson–Moss simply cannot be incorporated into the written warranty, and the manufacturer cannot make the use of it a prerequisite to the consumer's right to bring a civil suit under the Act. *See* 15 U.S.C. §§ 2310(a)(2) and (3); 16 C.F.R. §§ 703.2(a) and (b)(3); F.T.C. Statement of Basis and Purpose (for Rule on Informal Dispute Settlement Mechanisms, 16 C.F.R. § 703), 40 Fed.Reg. 60,190, 60,191 (1975).

## CHALLENGED PROVISIONS

The Plaintiffs challenge the following specific provisions of the New York State Lemon Law:

1) a requirement that mechanisms allow oral hearings if the consumer so requests (G.B.L. § 198–a(m)(1)(i)). The F.T.C. regulations permit mechanisms to allow an oral presentation only if both warrantor and consumer expressly agree to the presentation (16 C.F.R. § 703.5(f)(1)).

2) a requirement making the arbitrator's decision binding on the manufacturer, while it is not binding upon the consumer (G.B.L. § 198–a(h)). The F.T.C. regulations provide that mechanism decisions are nonbinding, and require only that the warrantor act in good faith in deciding whether and to what extent it will abide by a mechanism decision (16 C.F.R. §§ 703.2(g), 703.5(j)).

3) a requirement that the arbitrators participating in such mechanisms be trained in arbitration and be familiar with the provisions of the New York State Lemon Law (G.B.L. § 198–a(m)(1)(i)). The F.T.C. regulations require only that the mechanism be competently staffed so as to ensure the fair and expeditious resolution of disputes (16 C.F.R. § 703.3(a)).

4) additional recordkeeping requirements beyond those that would satisfy Magnuson–Moss (G.B.L. § 198–a(m)(3)). Compare the F.T.C. recordkeeping requirements at 16 C.F.R. § 703.6.

5) a clause requiring that manufacturers' mechanisms comply with the federal regulations, and thereby suggesting that the State of New York might have enforcement powers with respect to the federal regulations (G.B.L. § 198–a(m)(1)(ii)). Federal law makes compliance optional (15 U.S.C. § 2310(a)(2) and (3); 16 C.F.R. § 703.2(a)) and vests in the F.T.C. enforcement authority over any mechanism to which a written warranty requires a consumer to resort (15 U.S.C. § 2310(a)(4) and (c)).

6) a requirement that a notice detailing the consumer's rights and responsibilities under state law, entitled "New Car Lemon Law Bill of Rights," be provided to consumers and arbitrators (G.B.L. § 198–a(m)(2)). Magnuson–Moss regulates written information provided to consumers relating to written warranties but not made part of a written warranty (15 U.S.C. § 2302(b)(1)(B)).

The state requirements enumerated above do not appear draconian. The state

has made a policy decision that these measures would have a salutary effect upon the conduct of consumer dispute resolution, and perhaps they would. However, the question we must address is whether these measures can coexist with the policy determinations made and the measures enacted by Congress and the F.T.C.

## DISCUSSION

■ "In determining whether a state statute is pre-empted by federal law and therefore invalid under the Supremacy Clause of the Constitution, our sole task is to ascertain the intent of Congress." *California Federal Savings and Loan Ass'n v. Guerra,* 479 U.S. 272, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987) (*citing Shaw v. Delta Airlines, Inc.,* 463 U.S. 85, 95, 103 S.Ct. 2890, 2898, 77 L.Ed.2d 490 (1983) and *Malone v. White Motor Corp.,* 435 U.S. 497, 504, 98 S.Ct. 1185, 1190, 55 L.Ed.2d 443 (1978)). Pre-emption "is not to be lightly presumed." *California Fed. S. & L. v. Guerra,* 107 S.Ct. at 689 (*citing Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 2128, 68 L.Ed.2d 576 (1981)). Particularly when Congress legislates in a field traditionally occupied by the states, "we start with the assumption that the historic police powers of the States were not to be superseded by [federal law and regulations] unless that was the clear and manifest purpose of Congress." *Pacific Gas & Electric Co. v. Energy Resources Comm'n,* 461 U.S. 190, 206, 103 S.Ct. 1713, 1723, 75 L.Ed.2d 752 (1983) (*quoting Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). Because consumer protection and warranty law is a field traditionally occupied by the states, which Congress entered only in 1975 with the passage of Magnuson–Moss (*Chrysler Corp. v. Texas Motor Vehicle Comm'n,* 755 F.2d 1192, 1205 (5th Cir.1985)), compelling evidence of an intention to pre-empt is required in this area. *See Environmental Encapsulating Corp. v. City of New York,* 855 F.2d 48, 58 (2d Cir.1988).

[5] There are three well-established situations in which a court should find a state statute to have been pre-empted. The first arises when Congress has expressly stated its intention that state law be pre-empted. *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). Absent express pre-emption, implied pre-emption is found where the scheme of federal regulation is so comprehensive that it is reasonable to infer that Congress intended to occupy the field, and that it "left no room" for supplementary state regulation (*Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). Even where Congress has not completely displaced state regulation in a certain field, state law is pre-empted to the extent it actually conflicts with federal law, either because "compliance with both federal and state regulations is a physical impossibility" (*Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963)), or because the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (*Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). *See California Fed. S. & L. v. Guerra,* 107 S.Ct. at 689; *Michigan Canners & Freezers Ass'n, Inc. v. Agricultural Marketing & Bargaining Bd.,* 467 U.S. 461, 469, 104 S.Ct. 2518, 2522, 81 L.Ed.2d 399 (1984); *Fidelity Federal Savings & Loan Ass'n v. De la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982).

■ "Federal regulations have no less pre-emptive effect than federal statutes." *Fidelity Fed. S. & L. v. De la Cuesta,* 458 U.S. at 153, 102 S.Ct. at 3022; *see Environmental Encapsulating v. City, supra,* at 53. Where Congress has directed an agency to exercise discretion in fulfilling congressional policy, and where the agency thereupon promulgates regulations intended to pre-empt state law, the agency's decision to pre-empt will be upheld as long as it "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute ... unless it appears from the statute or its legislative history that the accommodation is not one

that Congress would have sanctioned." *Fidelity Fed. S. & L. v. De la Cuesta*, 458 U.S. at 154, 102 S.Ct. at 3023 (*quoting United States v. Shimer*, 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)); *see Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 699–700, 104 S.Ct. 2694, 2700, 81 L.Ed.2d 580 (1984). The mere fact that a federal agency has promulgated comprehensive regulations in a field is not sufficient to pre-empt state law. *Hillsborough County v. Automated Medical Labs*, 471 U.S. 707, 717, 105 S.Ct. 2371, 2377, 85 L.Ed. 2d 714 (1985). Pre-emption occurs when a federal agency promulgates regulations with the clear intent that they be exclusive (*see id.* at 718, 105 S.Ct. at 2377) or when state law interferes with federal regulatory policy (*see Fidelity Fed. S. & L. v. De la Cuesta*, 458 U.S. at 155–56, 102 S.Ct. at 3023–24).

The Magnuson–Moss Act established federal warranty disclosure requirements and a federal remedy for breach of warranty. *See Boelens v. Redman Homes, Inc.*, 748 F.2d 1058, 1061–62 (5th Cir.1984) (explaining purpose and general operation of the Act). The purpose of the Magnuson–Moss Act was to assure minimum warranty protection for consumers, to promote consumer understanding of warranties, to assure warranty performance, and to improve product reliability. 40 Fed.Reg. 60,168 (F.T.C.1975). Within that context, Congress explicitly declared it to be its policy "to encourage warrantors to establish procedures whereby consumer disputes are fairly and expeditiously settled through informal dispute settlement mechanisms." 15 U.S.C. § 2310(a)(1); *see* S.Conf.Rep. No. 1408, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.Code Cong. & Admin.News 7702, 7755, 7758. Presumably Congress hoped that many disputes would be settled in a co-operative rather than an adversarial

setting, so that the consumer could set forth the problem without the expense of going to court, and the manufacturer could evaluate the claim and provide relief quickly and quietly where merited.

 Congress authorized the F.T.C. to "prescribe rules setting forth minimum requirements for any informal dispute settlement procedure which is incorporated into the terms of a written warranty." 15 U.S. C. § 2310(a)(2). If a voluntary mechanism meets the minimum standards promulgated by the F.T.C., the manufacturer can require a consumer to seek resolution of any dispute through the mechanism before seeking to enforce in a civil suit any rights created by the Act. 15 U.S.C. § 2310(a)(3). This does not prevent the consumer from bypassing the mechanism in seeking to enforce rights and remedies other than those created by the Act.[1]

The F.T.C. has developed a regulatory scheme designed to balance the protection of consumers with the congressional imperative of "encouraging" manufacturers to establish such voluntary mechanisms. Plaintiffs assert that the states are entirely precluded from regulating dispute resolution mechanisms established by manufacturers because Congress and the F.T.C. have occupied that field. They further claim that New York's Lemon Law is inconsistent with the federal law and stands as an obstacle to the fulfillment of the full purposes of Congress, and they point out that it imposes upon manufacturers costs and burdens that the Commission explicitly considered and rejected.[2] According to Plaintiffs, the Lemon Law tries to forge a different balance from that so painstakingly designed by the F.T.C., and it cannot stand.

---

1. "Section 111(b) [i.e., the Magnuson–Moss Act's savings clause] and the Conference Report make clear that the consumer would be free to pursue alternate state or federal rights or remedies whether or not warrantor has incorporated a complying mechanism into the terms of his written warranty." F.T.C. Statement of Basis and Purpose (for Rule on Informal Dispute Set-

tlement Mechanisms, 16 C.F.R. § 703), 40 Fed. Reg. 60,190, 60,191 (1975).

2. For example, the Commission explicitly rejected mandatory oral hearings upon the consumer's request (*see* 40 Fed.Reg. at 60,209), binding arbitration (*see id.* at 60,210–11), and more extensive recordkeeping requirements (*see id.* at 60,211).

### 1. Has Congress expressly pre-empted state law?

Magnuson–Moss contains both an express pre-emption clause (§ 111(c), codified at 15 U.S.C. § 2311(c)) and an express savings clause (§ 111(b), codified at 15 U.S.C. § 2311(b)). The express pre-emption clause is specifically limited to state requirements that relate to labeling or disclosure with respect to written warranties or performance thereunder; that are within the scope of an applicable requirement of the sections of the Act (and regulations thereunder) pertaining to contents, designation, and minimum standards for written warranties; and that are not identical to the federal requirements. 15 U.S.C. § 2311(c)(1); see "Preemptive Effect of Section 111(c)(1) of Magnuson–Moss Warranty Act" (re: Wisconsin statute), 43 Fed. Reg. 50,737, 50,738 (F.T.C.1978).

■ Plaintiffs do not allege, and we do not find, express preemption of state law with respect to informal dispute settlement mechanisms. We note, however, that the existence of an express pre-emption clause does not signify that no other pre-emption of state law was intended. See Fidelity Fed. S. & L. v. De la Cuesta, 458 U.S. at 162, 102 S.Ct. at 3027.

### 2. Has Congress occupied the field?

The Attorney General of the State of New York claims that § 110 of the Magnuson–Moss Act, by authorizing the F.T.C. to promulgate "minimum" standards for warrantors' dispute settlement mechanisms, demonstrates that Congress did not intend to occupy the field. He asserts that Congress and the F.T.C. intended to allow supplementary state regulation in this area.

While it is true that the statute, 15 U.S. C. § 2310, and regulations, 16 C.F.R. §§ 703.3–703.8, refer to "minimum requirements" for the mechanisms, this wording is subject to more than one interpretation. It could be understood, as the Attorney General suggests, to mean that the states are free to supplement the federal regulations in this area. It could also be understood to mean only that the mechanisms themselves, or the manufacturers who control

them, are free to experiment with different provisions as long as they meet the minimum federal standards.

In Ray v. Atlantic Richfield Co., the Supreme Court declined to interpret a congressional reference to "minimum standards" that were to be established by an agency as requiring recognition of state authority to impose higher standards than the agency has prescribed. 435 U.S. 151, 168 n. 19, 98 S.Ct. 988, 1000 n. 19, 55 L.Ed.2d 179 (1978). The Court determined that where Congress had expressly anticipated that foreign vessels would be considered sufficiently safe for certification by the Secretary if they satisfied certain design requirements, there was no room for the states to impose different or stricter design requirements. Id. at 168, 98 S.Ct. at 999.

The reasoning in Ray v. Atlantic Richfield was partly based upon a determination that Congress intended that there be uniform federal standards for vessels operating in the navigable waters of the United States. Id. at 165–67, 98 S.Ct. at 998–99. While we see no indication that Congress or the F.T.C. sought to establish total uniformity of the mechanism system throughout the United States, the F.T.C. has stated that it intended that existing nation-wide mechanisms be preserved and utilized. 40 Fed.Reg. at 60,209. This preservation of interstate mechanisms would obviously be rendered more difficult, if not impossible, by the existence of a host of conflicting state lemon laws.

Plaintiffs state, and the Attorney General does not dispute, that there were no state lemon laws in existence when Magnuson–Moss was enacted in 1975. We doubt that Congress or the F.T.C., in speaking of "minimum" standards, envisioned so potentially disruptive and costly a situation as the individual regulation of manufacturers' mechanisms by each of the fifty states.

The Attorney General cites numerous cases standing for the proposition that Magnuson–Moss and the regulations promulgated thereunder do not occupy the field and do not pre-empt state law. We note,

however, that most of these cases are not on point because they do not deal with the specific question of whether the F.T.C.'s regulations governing voluntary dispute settlement mechanisms were designed to be so all-encompassing as to preclude state regulation of those particular entities, voluntarily established by manufacturers under the auspices of federal law. *See, e.g., Katharine Gibbs School (Inc.) v. Federal Trade Comm'n*, 612 F.2d 658 (2d Cir.1979) (at issue was the legality of an express pre-emption clause in F.T.C. regulations governing vocational and home study schools); *MacKenzie v. Chrysler Corp.*, 607 F.2d 1162 (5th Cir.1979) (issue was whether state or federal law controlled measure of damages for breach of warranty); *Walsh v. Ford Motor Co.*, 627 F.Supp. 1519 (D.D.C.) (at issue were class certification and availability of punitive damages under Magnuson–Moss Act), *rev'd and remanded on issue of class certification*, 807 F.2d 1000 (D.C.Cir.1986); *State ex rel. Guste v. Fedders Corp.*, 524 F.Supp. 552 (M.D.La.1981) (question presented was whether federal question jurisdiction existed under Magnuson–Moss where plaintiffs' complaint alleged only violations of state unfair trade practices law); *Skelton v. General Motors Corp.*, 500 F.Supp. 1181 (N.D.Ill., E.D.1980) (defining contours of "written warranty," "implied warranty," and "deceptive warranty" under Magnuson–Moss), *rev'd on issue of "written warranty"*, 660 F.2d 311 (7th Cir.1981); *People v. Ford Motor Co.*, 133 Misc.2d 828, 510 N.Y.S.2d 425 (N.Y.Sup.Ct.1986) (adjudicating pre-emption challenge to a N.Y. Lemon Law disclosure provision regarding N.Y. Attorney General's interpretation of Lemon Law); *Olmstead v. General Motors Corp., Inc.*, 500 A.2d 615 (Del.Super.Ct.1985) (construing reach of Magnuson–Moss requirements as to notice of breach and opportunity to cure).

The Attorney General appears to cite these cases simply for their reiteration of the fact that Congress did not intend that the statute or the regulations issued under it pre-empt all state law relating to warranties or deceptive trade practices. We are in agreement with the Attorney General as to that issue. There is no question but that Congress and the F.T.C. contemplated, and even invited, a continuing state presence in the field of warranty law. The Magnuson–Moss Act's savings clause specifically preserves rights and remedies under state law.[3] The issue is whether one extremely limited arena, that of manufacturers' dispute settlement mechanisms to which consumers must resort before bringing a civil suit under the Act, is the exclusive preserve of federal law.

The Fourth and Fifth Circuits are the only federal appellate courts to have discussed the pre-emptive effect of Magnuson–Moss and the F.T.C. regulations with respect to manufacturers' voluntary mechanisms. Both state that there is no room for state regulation in this area.

The Attorney General joins the Plaintiffs in directing our attention to *Chrysler Corp. v. Texas Motor Vehicle Comm'n*, 755 F.2d 1192 (5th Cir.1985), in which the Fifth Circuit held that a state administrative proceeding for warranty dispute resolution established by the Texas "lemon law" was not pre-empted by federal law. The Court was "unpersuaded ... that federal law occupies the field of informal settlement mechanisms for warranty disputes or that federal law either expressly or impliedly preempts the remedies and procedures created by [the Texas statute]." *Id.* at 1203–04. The Attorney General claims that the logic of the opinion, which holds that Congress did not intend to occupy the entire field of informal settlement mechanisms, leads to the conclusion that there is room for state regulation of manufacturers' mechanisms.

---

3. The savings clause provides as follows:

"(1) Nothing in this chapter shall invalidate or restrict any right or remedy of any consumer under State law or any other Federal law.

(2) Nothing in this chapter (other than sections 2308 and 2304(a)(2) and (4) of this title) shall (A) affect the liability of, or impose liability on, any person for personal injury, or (B) supersede any provision of a State law regarding consequential damages for injury to the person or other injury."
15 U.S.C. § 2311(b).

Plaintiffs point out that the Court explicitly distinguished between the type of state-run arbitration program established by Texas law and at issue in that case, and the manufacturers' dispute resolution mechanisms at issue here. The Court stated: "We think it plain that the *preclusive effect of section 110 is limited to rules governing informal dispute resolution procedures created by private warrantors* and does not affect such schemes where provided as an option for consumers by state law." *Id.* at 1206 (emphasis added). The Attorney General replies that this was not the issue before the Court.

The Fourth Circuit, in addressing the question of whether a consumer could challenge the operation of a manufacturer's dispute resolution mechanism through a state fraud action, determined that it was Congress's intent that only the F.T.C. have authority to supervise whether the manufacturers' mechanisms are created and operated fairly. *Wolf v. Ford Motor Co.*, 829 F.2d 1277, 1279 (4th Cir.1987). The Court stated: *"The FTC regulations* are extensive and address all facets of the mechanisms' operation. They *leave no room for state regulation." Id.* (emphasis added). The Attorney General asserts that this is dictum, that it is wrong, and that the *Wolf* Court ignored the Supreme Court's statement in *Hillsborough County v. Automated Medical Labs* that federal *agencies* must be explicit when exercising any purported authority to pre-empt state law.[4]

The Attorney General takes issue with both circuit court opinions, and he directs the Court's attention to two cases in which federal district courts in Minnesota and Kentucky have upheld provisions of state lemon laws that affect manufacturers' mechanisms. Some of those provisions are similar to provisions of the New York Lemon Law.

Minnesota's lemon law, like the New York law, requires that manufacturers' mechanisms offer consumers the opportunity to make an oral presentation. Unlike the New York law, it requires manufacturers to provide dispute resolution mechanisms, and it allows consumers to be charged a fee for the use of such a mechanism. *See Automobile Importers of America, Inc. v. Minnesota*, 681 F.Supp. 1374, 1376 (D.Minn.1988) (*citing* Minn.Stat. Ann. § 325F.665). Federal law, as noted, allows oral hearings only upon the agreement of both parties (16 C.F.R. § 703.5(f)), and it does not require manufacturers to provide a mechanism (15 U.S.C. § 2310(a)), and does not allow them to charge consumers a fee for the use of a mechanism they choose to provide (16 C.F.R. § 703.3(a)). The Minnesota Court found that Congress and the F.T.C. had not "occupied the field" of manufacturers' mechanisms. It pointed out that the express pre-emption clause could have included informal dispute settlement mechanism procedures and did not do so; rejected an attempt by the plaintiffs to distinguish between substantive rights and procedural requirements; and found that there was not sufficient indication of congressional intent to pre-empt state law in this area. *Automobile Importers v. Minnesota*, 681 F.Supp. at 1378–79. That Court distinguished *Wolf v. Ford* because it did not involve a challenge to a state lemon law. It declined to distinguish between state-run mechanisms and manufacturers' mechanisms in construing the Fifth Circuit's holding in *Chrysler v. Texas M.V.C.*, and declared that even if it were to accept that distinction, the Fifth Circuit's statement that "the preclusive effect of section 110 is limited to rules governing informal dispute resolution procedures created by private warrantors" is mere dictum. *Id.* at 1378 & n. 4.

The Kentucky Court determined that Kentucky's requirement that manufactur-

---

**4.** There, the Court stated: "[B]ecause agencies normally address problems in a detailed manner and can speak through a variety of means, including regulations, preambles, interpretive statements, and responses to comments, we can expect that they will make their intentions clear if they intend for their regulations to be exclu-sive. Thus, if an agency does not speak to the question of pre-emption, we will pause before saying that the mere volume and complexity of its regulations indicate that the agency did in fact intend to pre-empt." 471 U.S. at 718, 105 S.Ct. at 2377.

ers' mechanisms hold an oral hearing unless such a hearing is waived by the consumer was within the express savings clause because it created a right or remedy to consumers under state law. *See Chrysler Corp. v. Armstrong,* No. 83–45, slip op. at 1 (E.D.Ky. Apr. 30, 1985) (*citing* Ky.Rev. Stat. § 367.860 *et seq.*). That Court did not specifically discuss the issue of federal intent to occupy the field of regulations of manufacturers' mechanisms. It relied upon an F.T.C. staff opinion stating:

"The Warranty Act and its history show no Congressional intent whatsoever to occupy the field of warranty law, or even to exercise exclusive jurisdiction as to those aspects of warranty law addressed in the Act. On the contrary ... Congress incorporated an express provision that strictly defines the areas of state law which were to be preempted. This provision was revised and narrowed numerous times in successive drafts of the bill. Furthermore ... Congress included a broad savings clause, expressly preserving a wide range of state laws that give consumers rights and remedies not provided by the federal law. In such a context, a finding of implied preemption of a state law outside the narrow realm of express preemption must be based on strong evidence of a necessary conflict with the federal Act or rule."

Letter from F.T.C.'s William P. Golden and Rachel Miller to Kevin Noland, Kentucky A.A.G. (undated, but presumably written in early 1985), New York Attorney General's Memo of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment and in Support of his Motion to Dismiss, dated Feb. 16, 1988, at Appendix C.

The F.T.C. in 1975 invited and considered comment on its proposed regulations, and it drew up an extremely detailed and comprehensive set of regulations designed to balance the competing interests, and to encourage manufacturers to establish or participate in dispute settlement mechanisms. Throughout the F.T.C.'s Statement of Basis and Purpose are repeated references to the agency's effort to find an equilibrium that keeps the burdens on manufacturers to a minimum while still sufficiently protecting the consumer. *See* 40 Fed.Reg. at 60,190–215. For example, the F.T.C. tells us that "[t]he legislative scheme of 'encouraging' warrantors to voluntarily bear the cost of establishing informal mechanisms necessitates a careful analysis of costs or other disincentives that might result from the Commission rule." [5] It would appear that the Commission did not contemplate the coexistence of regulation from other sources that would increase the potential discouragement of the mechanisms.

■ The principal incentive for manufacturers to establish complying mechanisms is that they may require consumers to resort to the mechanisms before bringing suit to enforce rights and remedies under the Act. *See* Schroeder, *Private Actions Under the Magnuson–Moss Warranty Act,* 66 Calif.L.Rev. 1, 33 (1978). In other words, a manufacturer who establishes a mechanism meeting specific federal criteria has a federally granted right to require consumers to utilize that mechanism as a prerequisite to bringing suit under the Act. It is difficult to imagine that Congress contemplated that the states should be involved in regulating these mechanisms, whose existence was integrally related to a set of interwoven federal

---

**5.** 40 Fed.Reg. at 60,191. The Statement continues:

"The intent of the Act is to provide for fair and expeditious settlement of consumer warranty disputes, through informal mechanisms established voluntarily by warrantors. The Commission has determined that this legislative scheme is best implemented by a careful balancing of consumer and warrantor interests. The Rule is intended to establish a framework for fair and expeditio[u]s settlement of warranty disputes at cost levels acceptable to warrantors...."

"The Rule will permit a wide variation in form and procedures among complying mechanisms, in recognition of the variety among effective complaint handling mechanisms currently in existence. The intent is to avoid creating artificial or unnecessary procedural burdens so long as the basic goals of speed, fairness and independent participation are met."
*Id.* at 60,193.

rights and remedies, explicitly segregated from state-created rights and remedies by the savings clause. We hold that there is no room in this system for states to tinker with the federal criteria, possibly discouraging the creation of mechanisms, and possibly "outlawing" mechanisms that the federal government has defined to be acceptable and capable of triggering the manufacturers' federal right to require consumers to resort to them before going to court.

While we do not find language explicitly making federal regulations exclusive in this area, we do not read *Hillsborough County v. Automated Medical Labs* to require that there be such language.[6] The degree of comprehensiveness of the federal regulations in conjunction with the F.T.C.'s many expressions of the importance of balancing consumer and warrantor interests, and its descriptions of the efforts to achieve an equilibrium that would encourage manufacturers to establish mechanisms voluntarily, bespeak a clear intent that the federal regulations govern the mechanisms exclusively. This is sufficient to stake out a claim to the exclusive federal regulation of manufacturers' mechanisms.

■ Where Congress or a federal agency has striven to create a balanced relationship between competing interests through comprehensive statutory or regulatory treatment, state law that would upset that balance is pre-empted, whether it be statutory or common law. *See, e.g., International Paper v. Ouellette*, 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987) (Clean Water Act pre-empts law of states affected by pollution except law of state in which polluting source is located, because Congress established system requiring Environmental Protection Agency and source state to make pollution decisions by weighing costs and benefits, and affected state must not interfere with resulting balance of interests); *Transcontinental Gas Pipe Line Corp. v. State Oil & Gas Bd.*, 474 U.S. 409, 106 S.Ct. 709, 88 L.Ed.2d 732

(1986) (congressional determination to reduce federal regulation to allow market forces to set price pre-empts state regulation that would upset intricate cost relationships of the market); *Michigan Canners & Freezers Ass'n., Inc. v. Agricultural Marketing & Bargaining Bd.*, 467 U.S. 461, 104 S.Ct. 2518, 81 L.Ed.2d 399 (1984) (Agricultural Fair Practices Act pre-empts state marketing statute that undermines balanced relationship Congress sought to establish between agricultural producers and "handlers"); *Palmer v. Liggett Group*, 825 F.2d 620 (1st Cir.1987) (state law tort action against cigarette company for failure to warn adequately of health danger was pre-empted by federal system of warning labels designed to balance national health policy of smoking education and protection of trade and commerce aspects of tobacco industry); *Baird v. General Motors Corp.*, 654 F.Supp. 28 (N.D.Ohio, E.D.1986) (state law tort action against automobile manufacturer claiming defective design because of lack of airbags was pre-empted by federal regulatory scheme which gave manufacturers choice among three safety options in attempt to provide flexibility.in development of safety technology). This is true despite the existence of a general savings clause. *See International Paper v. Ouellette*, 107 S.Ct. at 808, 812. "If the state law disturbs too much the congressionally declared scheme—whether denominated as 'occupying the field' or 'actually conflicting with federal law'—it will be displaced through the force of pre-emption." *Palmer v. Liggett Group, Inc.*, 825 F.2d at 626.

Here Congress has sought to achieve its goal, in part, by encouraging the voluntary establishment of mechanisms to settle consumer disputes fairly, expeditiously, and inexpensively. To the extent that state law interferes with the balancing of interests the F.T.C. has reached in an effort to fulfill the congressional mandate, such state law

6. *See* note 4, *supra*, for relevant text from *Hillsborough County; cf. California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 107 S.Ct. 1419, 1426–27, 94 L.Ed.2d 577 (1987) (quoting same paragraph from *Hillsborough County* and finding that federal Forest Service regulations in question not only were devoid of any expression of intent to pre-empt state law, but in fact expressly required compliance with parallel state laws and regulations).

is pre-empted. *International Paper v. Ouellette,* 107 S.Ct. at 813.

### 3. *Is there a conflict between state and federal law?*

■■■ Questions of conflict arise concerning both the effect of the Lemon Law on the entire federal regulatory scheme governing manufacturers' mechanisms, and the relationship between federal and state law relating to particular aspects of those mechanisms. In determining whether the Lemon Law "stands as an obstacle" to the full purposes of Magnuson–Moss, it is not enough to say that the ultimate goal of both laws is consumer protection. *See International Paper v. Ouellette,* 107 S.Ct. at 813. A state statute is pre-empted if it interferes with the methods by which Congress sought to achieve its goal. *Id.* As discussed, Congress explicitly declared it to be its policy to encourage manufacturers to establish mechanisms voluntarily, and empowered the F.T.C. to develop regulations governing such mechanisms.

We approach the question of whether the Lemon Law frustrates congressional policy by comparing the federal and state regulations as they affect the specific workings of the mechanisms. The F.T.C. and the Lemon Law differ as to the circumstances calling for oral hearings and as to the binding or non-binding nature of mechanism decisions. The Lemon Law makes more exacting demands than the federal regulations as to the qualifications of mechanism staff, and as to the extent of recordkeeping required. It requires that mechanisms comply with the F.T.C. regulations, which are optional in the federal scheme, and it adds a requirement that consumers and arbitrators receive a copy of the "New Car Lemon Law Bill of Rights," a document outlining consumers' substantive rights and responsibilities under state law, prior to arbitration.

#### a. Mandatory oral hearings and binding arbitration

The Attorney General claims that *A.I.A. v. Minnesota,* in which the Court upheld a law requiring, *inter alia,* that manufacturers provide dispute resolution mechanisms, and that these mechanisms allow oral hearings, is dispositive as to all the issues in this case. Plaintiffs assert that that opinion is wrong and is being appealed, and that in any case it is distinguishable. We agree with Plaintiffs that since the Minnesota statute *requires* manufacturers to establish informal dispute settlement mechanisms (*A.I.A. v. Minnesota,* 681 F.Supp. at 1376), it cannot be attacked as obstructing the goal of *encouraging* them to do so, and thus it is distinguishable.

On the issue of conflict, the Attorney General again urges upon us the decision of the Kentucky Court holding that the mandatory oral hearing provision of the Kentucky lemon law was not pre-empted by Magnuson–Moss, and the advisory opinion of the F.T.C. Staff relating to that litigation. *See Chrysler Corp. v. Armstrong,* No. 83–45, slip op. (E.D.Ky. Apr. 30, 1985) and Golden and Miller Letter, *supra,* at C–11.

The F.T.C. Staff opinion advised Kentucky's Attorney General that the state provision requiring mechanisms that otherwise comply with the federal regulations to provide for an oral hearing unless the consumer waives it created "no direct conflict with the federal law or rule." Golden and Miller Letter, *supra,* at C–11. The Court noted that this was not a Commission determination and thus was not entitled to the deference afforded under 15 U.S.C. § 2311(c)(2), but it nonetheless accepted the Staff's reasoning that: 1) the federal rule sets only minimum standards for procedure, and that a mechanism that meets its state obligations by adopting federal procedures plus oral hearings would comply with the federal rule; and 2) federal law does not prohibit non-complying mechanisms, and thus "even if a warrantor adopts procedures under Kentucky law that actually conflict with the federal procedures, the warrantor can comply with federal law simply by refraining from incorporating the mechanism into the warranty." Golden and Miller Letter, *supra,* at C–11 n. 11. The Court opined that there were "no certain or inescapable conflicts between the Kentucky statutes and the Magnuson–Moss Act, its underlying purposes and ob-

jectives, or its implementing regulations, particularly 16 C.F.R. § 703.5(f) [allowing oral presentations only if both parties agree to it], which would require a finding of pre-emption by implication." *Chrysler Corp. v. Armstrong, supra,* No. 83–45, slip op. at 1.

Plaintiffs in the instant case claim that the federal regulations governing oral hearings and the non-binding nature of mechanism rulings bestow upon manufacturers benefits of which a state cannot divest them. The Supreme Court has recently addressed a similar problem regarding the attachment of Social Security benefits. Where "[42 U.S.C.] Section 407(a) unambiguously rules out any attempt to attach Social Security benefits" and an Arkansas statute "just as unambiguously allows the State to attach those benefits," the Court found that "this amounts to a 'conflict' under the Supremacy Clause—a conflict that the State cannot win." *Bennett v. Arkansas,* — U.S. —, 108 S.Ct. 1204, 1205, 99 L.Ed.2d 455 (1988). The Kentucky Court did not have the benefit of this guidance when it rendered its decision in *Chrysler v. Armstrong.*

■ We perceive such a conflict with respect to the Lemon Law's provisions governing both oral hearings and the extent to which mechanism arbitration is binding. While the federal regulations explicitly state that oral presentations will be allowed only if both warrantor and consumer expressly agree to such oral presentation (16 C.F.R. § 703.5(f)(1)), the New York Lemon Law just as explicitly states that consumers, upon request, must be given an opportunity to make an oral presentation (G.B.L. § 198–a(m)(1)(i)). While federal law provides that the decision of a mechanism shall not be legally binding upon any person,[7] and simply requires that the warrantor act in good faith (16 C.F.R. §§ 703.-2(g) and 703.5(j)), subject to supervision by the F.T.C. (15 U.S.C. § 2310(a)(4)), the New York Lemon Law provides that the manufacturer is bound by the decision of a mechanism if the consumer so elects, and that

the consumer is never bound by such a decision (G.B.L. § 198–a(h)).

The oral hearing and binding arbitration provisions of the New York Lemon Law cannot stand because they directly conflict with explicit provisions of federal law. From the manufacturers' perspective, what the federal law giveth, the state law taketh away, and under *Bennett v. Arkansas* the state law must fall.

Furthermore, we agree with the Plaintiffs that Congress has declared that if manufacturers establish mechanisms that meet the F.T.C.'s minimum standards, they have a federally granted right to incorporate such mechanisms into their written warranties, and to require consumers to resort to those mechanisms before pursuing in court any rights under the Act. The manufacturer cannot, however, require consumers to submit a dispute to a non-complying mechanism. 15 U.S.C. §§ 2310(a)(2) and (3); 16 C.F.R. §§ 703.2(a) and (b)(3). The Lemon Law requires mechanisms operated by New York manufacturers to adopt procedures that would make them noncomplying mechanisms under the federal regulations. If upheld, these elements of the statute would therefore deprive New York manufacturers who operate qualifying mechanisms of their federally granted right to require consumers to resort to those mechanisms.

In addition, in its attempt to balance consumers' and manufacturers' needs, the F.T.C. explicitly considered and rejected proposed regulations that called for oral hearings upon the consumer's request and for arbitration binding upon the manufacturer but not upon the consumer. As noted, the Commission sought to preserve pre-existing dispute resolution mechanisms operating at a national level. 40 Fed.Reg. at 60,209. Its decision that a mechanism "may allow" an oral presentation only if both parties expressly agree to it was largely based upon the logistical problems of these national mechanisms, which gather their information by telephone or mail. *Id.* The F.T.C. had determined that "the

---

7. 16 C.F.R. § 703.5(j). The findings of a mechanism are, however, admissible as evidence in court. 15 U.S.C. § 2310(a)(3); 16 C.F.R. § 703.5(j).

need to foster a variety of Mechanisms, including national ones, is greater than the need for oral presentations at the behest of the parties." *Id.* If every state could establish different and possibly conflicting regulations binding upon any mechanism operating within its borders or on behalf of its manufacturers, the federal purpose of fostering national mechanisms would be thwarted.

As to whether mechanism decisions should be binding on the warrantor alone, the F.T.C. was "not persuaded that [this approach] would benefit consumers more than it would discourage warrantors from adopting Mechanisms." 40 Fed.Reg. at 60,211. The delicate interweaving of elements of the system, and the search for balance that permeates the regulations, are evident here: it is because of the non-binding nature of mechanism decisions, along with the fact that manufacturers can require the consumer to use the mechanism, that the F.T.C. refused to allow manufacturers to charge consumers a fee for submitting a dispute to a mechanism. 40 Fed. Reg. at 60,204.

The Lemon Law provisions requiring oral hearings and arbitration binding on the manufacturer but not on the consumer are destructive of this balance. By depriving the manufacturer of the right to require consumers to submit disputes to a mechanism (since a mechanism that obeyed New York law would be a noncomplying mechanism under the federal regulations), the Lemon Law would strip the federal scheme of its most potent incentive for encouraging manufacturers to create and use voluntary informal mechanisms. The added costs that these provisions would impose on manufacturers could be serious disincentives to the voluntary establishment of dispute resolution mechanisms.

These state requirements also hinder the congressional goal of increasing disclosure and improving public understanding with respect to warranties. As discussed, under

Magnuson–Moss, a manufacturer is not allowed to incorporate a non-qualifying dispute resolution mechanism into the terms of its written warranty. As we understand the statute (15 U.S.C. § 2310(a)(2)), the applicable regulation (16 C.F.R. § 703.2(a)), and the relevant portion of the F.T.C. Statement,[8] this means that no reference may be made in the written warranty to a non-complying mechanism. A mechanism that complies with the New York Lemon Law's oral hearing and binding arbitration requirements would be a non-complying mechanism under Magnuson–Moss.

The prohibition of any mention of a manufacturer's mechanism in the written warranty due to compliance with the Lemon Law that results in non-compliance with Magnuson–Moss would impede the congressional goal of ensuring consumer awareness of the existence of the mechanism. The F.T.C. recognized the importance of this goal and made it a focal point of the regulations concerning disclosure of the mechanism (*see* 40 Fed.Reg. 60,194–99), observing that "[t]he Senate Report on the Act stressed the Committee's belief that Mechanisms will only be useful if consumers realize they exist." *Id.* at 60,194.

While the manufacturer does have the *option* under Magnuson–Moss of establishing a non-complying mechanism that it is prohibited from mentioning in its written warranty (and that it therefore cannot make a prerequisite to suit under the Act), this flexibility serves the congressional purpose of encouraging manufacturers to establish dispute resolution mechanisms by allowing them a certain leeway in creating their mechanisms. In contrast, the Lemon Law's oral hearing and binding arbitration clauses would effectively decrease the information readily available to consumers, and at the same time would serve to discourage rather than encourage the creation of such mechanisms. These provisions thus conflict with several federal goals,

---

**8.** "It should be noted that under Section 70[3].2(a) warrantors may include information regarding their own internal procedures for handling warranty disputes. To prevent consumers from being misled into believing a

Mechanism included under this provision complies with the Rule in Part 703 and must be used by the consumer, in certain instances, only complying Mechanisms can be included in the written warranty." 40 Fed.Reg. at 60,193–94.

and with the methods designed to implement them.

### b. Recordkeeping and staff qualifications

■ Plaintiffs attack two other provisions of the Lemon Law as hindering the congressional policy of encouraging warrantors to establish informal dispute settlement mechanisms. One requires more extensive recordkeeping than is required by the F.T.C. regulations. *Compare* G.B.L. § 198–a(m)(3) *with* 16 C.F.R. § 703.6. The other requires that mechanism staff be trained in arbitration and familiar with the Lemon Law, while the F.T.C. regulations require only that they be competent and that they act fairly and expeditiously. *Compare* G.B.L. § 198–a(m)(1)(i) *with* 16 C.F.R. § 703.3.

The Attorney General argues that these state requirements are de minimis, and that they do not conflict with the federal regulatory scheme. He directs our attention to *Hillsborough County v. Automated Medical Labs*, where operators of blood plasma centers took a position similar to that of the Plaintiffs here, alleging that county ordinances with more stringent requirements than federal regulations under the Public Health Service Act presented a serious obstacle to the federal goal of ensuring an adequate supply of plasma. 471 U.S. at 720, 105 S.Ct. at 2378. They claimed that county fees and donor testing, donor identification, and recordkeeping requirements beyond those contained in the federal regulations would both burden plasma centers financially and reduce the number of plasma donors, resulting in an important reduction in plasma available. *Id.* The Court found that, while "overly restrictive local legislation" could undoubtedly threaten the national plasma supply, the Food and Drug Administration, to which Congress had delegated the administration of the federal program, could be expected to monitor the effects of local requirements on that program on a continuing basis. *Id.* at 721, 105 S.Ct. at 2379.

As in *Hillsborough County,* Congress has here delegated to a federal agency the administration of a federal program. The F.T.C. has the authority to promulgate regulations that specifically preempt local legislation, and it can be expected to monitor the effects of state and local legislation on the federal warranty program. However, while in *Hillsborough* the F.D.A. was found not to have expressed clearly any intention that its regulations be exclusive, we have found here that the F.T.C. did make clear its intention to exercise exclusive regulatory power over voluntary dispute resolution mechanisms. In addition, more specifically related to the issue of conflict, the F.T.C. carefully considered the extent of recordkeeping and staff qualifications it would demand, and it rejected proposals involving more stringent requirements.

With respect to recordkeeping, the agency took into account concerns about cost levels and the need to preserve the confidentiality of sensitive records, and it adopted requirements consistent with the existing practices of complaint-handling bodies wherever possible. 40 Fed.Reg. at 60,211. The Commission sought to achieve its objectives of facilitating fair and efficient complaint handling, recognition of industry-wide problems, and monitoring of the mechanisms, by means of the least burdensome recordkeeping requirements possible. *Id.* After considering objections to proposed requirements, the Commission modified its proposed rule "to effect a general or over-all reduction in the recordkeeping obligation," having determined that "the requirements as set forth are sufficient to meet [its] fundamental recordkeeping objectives." *Id.*

The federal regulations call for specific individual records to be maintained on each dispute, and for statistical indexes to be compiled showing the number of disputes and the degree of compliance with mechanism determinations for each warrantor. 16 C.F.R. § 703.6. The Lemon Law requires additional and different statistical information involving the kinds of remedies requested by consumers and the number of each kind awarded, and calculations as to the average number of days required for certain stages of the process. G.B.L.

§§ 198–a(m)(3). The Lemon Law obligations, while perhaps not overwhelming in an age of computer technology, are burdensome in that they require more and different information than the F.T.C. determined would provide necessary information without acting as a disincentive to the establishment of mechanisms.

With respect to staff qualifications, the basic federal requirement is that a person charged with deciding a dispute should be competent to provide fair and expeditious resolution of disputes. 16 C.F.R. § 703.3(a). The principal concern was that that person should not have any interest in the dispute that would cause him or her to be biased. *See* 40 Fed.Reg. at 60,205–06. The "competence" required by the regulations involves essentially the ability to gather the information necessary for a fair decision in each dispute. *Id.* at 60,203.

Like additional recordkeeping demands, additional training requirements would increase manufacturers' costs. Varying state recordkeeping demands and requirements that mechanism staff be versed in the workings of state lemon laws, particularly if multiplied by several states, would also impose significant burdens on mechanisms operating on a national level. The additional requirements of New York law thus endanger the balance that the F.T.C. sought to establish and preserve, as well as depriving manufacturers of their federally granted right to incorporate into their warranties and require the use of any mechanism that complies with the F.T.C.'s minimum standards.

### c. Enforcement

■ Plaintiffs next attack the clause of the Lemon Law that requires "that the rights and procedures used in the mechanism comply with federal regulations promulgated by the federal trade commission relating to informal dispute settlement mechanisms" (G.B.L. § 198–a(m)(1)(ii)), even as the statute itself requires those same mechanisms to follow procedures that conflict with those established by the F.T.C. In addition to any inherent inconsistency in the statute, there is a question as to whether the state has the power to enforce its requirement that mechanisms obey the federal regulations.

Two issues arise under this question: one is whether the state can require mechanisms to comply with federal regulations that the federal government has made optional, and the other is whether the state, through its Attorney General, has the power to oversee compliance with the federal scheme at all.

With respect to the first issue, a state law that "limit[s] the availability of an option" the federal government has created and considers essential is pre-empted because it stands as an obstacle to the fulfillment of the full purposes and objectives of Congress. *Fidelity Fed. S. & L. v. De la Cuesta,* 458 U.S. at 156, 102 S.Ct. at 3024; *see Baird v. General Motors Corp.,* 654 F.Supp. at 32–33. In the instant case, the federal government has chosen to *encourage* rather than to mandate the creation and use of manufacturers' mechanisms, and it has equally chosen to *encourage* rather than mandate compliance by those mechanisms with federal standards. It encourages compliance by allowing manufacturers to require consumers to resort to such a mechanism before bringing suit under the Act. Neither Congress nor the F.T.C. has suggested that non-complying mechanisms should be further penalized than by having this right denied them. To the extent G.B.L. § 198–a(m)(1)(ii) obliges manufacturers' mechanisms to comply with the otherwise optional federal regulations, it conflicts with the equilibrium established by Congress and the F.T.C., and it discourages rather than encourages the creation of mechanisms by manufacturers who are for some reason unwilling or unable to comply with the federal regulations but wish to provide some sort of optional dispute resolution procedure for their customers.

The Fourth and Seventh Circuits have spoken on the second question. The Seventh Circuit noted that the Magnuson–Moss Act provides:

> "that the United States Attorney General and the Federal Trade Commission may go to federal court to enjoin violations of

the Act. 15 U.S.C. § 2310(c). Thus, the Act provides its own mechanism for protecting the general public's interest in enforcement of its provisions. It does not leave protection of the public interest up to the Attorneys General of the fifty states. *Compare* 15 U.S.C. §§ 15a–15h (explicitly vesting power in state Attorneys General to maintain actions against persons engaged in anti-competitive practices which harm state consumers)."

*In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1128 n. 33 (7th Cir.), *cert. denied*, 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979).

Still closer to the issue at hand, the Fourth Circuit has stated that:

"the Magnuson–Moss Act's endorsement of private dispute settlement mechanisms ..., coupled with its mandate that the Federal Trade Commission prescribe minimum requirements for such mechanisms, evince a congressional intent to reserve to the federal regulatory body the authority to supervise whether the mechanisms are created and operated fairly."

*Wolf v. Ford Motor Co.*, 829 F.2d at 1279.

To the extent that G.B.L. § 198–a(m)(1)(ii) purports to vest the Attorney General of the State of New York with authority to oversee compliance with the federal regulations, we find that it further conflicts with the federal scheme.

### d. "Bill of Rights"

Given that we have held, in accord with the Fourth Circuit, that the federal regulations have occupied the field of manufacturers' informal dispute settlement mechanisms (*see Wolf v. Ford Motor Co.*, 829 F.2d at 1279), and that we have established a number of ways in which the state statute actually conflicts with the federal statute and regulations, we need not establish that every detail of the challenged portions of the Lemon Law conflicts with federal law. We will nonetheless point to problems attending the last aspect of the law challenged here: the requirement that consumers and arbitrators be provided with the "New Car Lemon Law Bill of Rights"

upon submission of a dispute to such a mechanism.

Plaintiffs claim that the "Bill of Rights" is false and misleading in several respects, and that the requirement that a manufacturer provide it to consumers therefore runs afoul of federal law. The Magnuson–Moss Act empowers the F.T.C. to prescribe rules governing "the manner and form in which information with respect to any written warranty ... [shall be presented] so as not to mislead the reasonable, average consumer, when such information is contained in advertising, labeling, point-of-sale material, or other representations in writing." 15 U.S.C. § 2302(b)(1)(B). The F.T.C. states that it "encourages the disclosure of product information which is not deceptive and which may benefit consumers, and will not construe the Act to impede information disclosure in product advertising or labeling." 16 C.F.R. § 700.3(a).

As an example of false and misleading information, Plaintiffs cite the first point in the Bill of Rights, which states that: "In addition to any warranties offered by the manufacturer, your new car is warranted against all material defects for eighteen thousand miles or two years, whichever comes first." G.B.L. § 198–a(m)(2)(1). Plaintiffs say that this would mislead the average consumer because it suggests: 1) that the statutory warranty exists irrespective of whether the manufacturer has furnished "express warranties," which is not true; 2) that the statutory warranty is unconditional, which is not true because it depends upon "terms or conditions precedent" that the manufacturer may have imposed; 3) that there is warranty coverage for all parts of a motor vehicle, which is not true; and 4) that only material defects are covered, which is not necessarily true.

The Attorney General replies that Plaintiffs misconstrue both the state and the federal law. He says that Point 1 of the "Bill of Rights" is designed to be a simple and concise summary of the law to give notice to consumers of their general rights under the Lemon Law, and is of course limited by the actual substantive text of that statute, to which the consumer must

also look. He claims that 15 U.S.C. § 2302(b)(1)(B) imposes no affirmative obligations, but simply empowers the F.T.C. to act, and that 16 C.F.R. 700.3(a) does nothing more than encourage the nondeceptive disclosure of product information. Thus, he claims, the Lemon Law does not require manufacturers to do anything directly prohibited by the Act or the regulations.

▇▇▇▇▇ It appears to us that 15 U.S.C. § 2302(b)(1)(B) applies to written materials designed to induce a buyer to purchase the consumer good, rather than to information designed to make the buyer aware of state-provided rights and responsibilities at a time that is by definition after the purchase. It also appears to us that 16 C.F.R. § 700.3(a) applies to product information rather than legal information. Nonetheless, we disagree with the Attorney General to the extent that he suggests that the federal statute does not impose any affirmative obligation to refrain from providing false and misleading information in written representations outside the written warranty. However, we do not here decide whether the information required by the "Bill of Rights" is false and misleading, or what the result would be if it were. Rather we base our decision that this requirement is pre-empted on the fact that it is an element of the state's attempt to govern in an area in which it is precluded from acting.

We also find invalid G.B.L. § 198–a(g) because it requires manufacturers' informal dispute resolution mechanisms to comply with state laws that we have here held pre-empted.

It may be noted that there is some ambiguity as to the status of non-complying mechanisms under Magnuson–Moss, what rules they must follow, and who has authority to oversee them. We do not undertake to answer those questions, as the answers would not affect our decision with respect to the offending clauses of the statute here.

We find that the challenged provisions of the New York Lemon Law "stand as an obstacle to" the explicit congressional goal of encouraging manufacturers to establish voluntary mechanisms. The F.T.C. strove to balance the needs of manufacturers with the needs of consumers, and fashioned a delicate equilibrium which, even if considered by a state to be imperfect, is aimed at furthering the congressional purpose of encouraging such mechanisms.

Here, Plaintiffs not only claim that the New York Lemon Law could discourage manufacturers from establishing mechanisms, but also they present evidence that it has already caused two automobile manufacturers, Nissan and General Motors, to stop sponsoring or participating in voluntary mechanisms in New York although they continue to offer such programs in other states. *See* Declaration of Douglas Lawrence, National Warranty Manager for Nissan Motor Corp., U.S.A., in support of Plaintiffs' motion, dated Oct. 14, 1987; Declaration of Richard J. Bugno, General Director, Service Operations for General Motors Corp., in support of Plaintiffs' motion, dated Feb. 2, 1988.

The Attorney General calls these affidavits "conclusory and self-serving," and points out that lemon laws with similar provisions exist in other states in which manufacturers, including Nissan and G.M., have not withdrawn from participating in mechanisms. He also provides numerous examples of manufacturers that still participate in mechanisms in New York, and thus appear willing to abide by the strictures of the Lemon Law.

We do not base our decision upon the facts presented with respect to this issue, but on the law as explained above. We simply note: 1) that Plaintiffs allege that the reason other New York manufacturers have so far continued to offer their pre-existing programs is that the Attorney General has agreed to refrain from prosecuting them under the Lemon Law until this case is decided; and 2) that the Attorney General has not suggested other, unrelated factors that might explain why Nissan and G.M. have ended their programs.

### SEVERABILITY

▇▇▇▇ The question arises whether the elements of the Lemon Law that regulate

manufacturers' informal dispute settlement mechanisms are severable from the Lemon Law as a whole. Severability is determined by state law. *See Watson v. Buck,* 313 U.S. 387, 395–96, 61 S.Ct. 962, 964, 85 L.Ed. 1416 (1941). Under New York law, invalid parts of a statute "may be severed from the remainder if ... the remaining portions are sufficient to effect the legislative purpose deductible from the entire act," unless "the valid and invalid portions are so interwoven that neither can stand alone." N.Y.Statutes, § 150(d) (McKinney 1971) (footnotes omitted); *see Environmental Encapsulating Corp. v. City of New York,* 855 F.2d 48, 59–60 (2d Cir.1988).

 The 1986 amendments governing manufacturers' dispute resolution mechanisms are certainly severable from the rest of the Lemon Law. They were appended to a statute which can, without them, continue to fulfill its purpose of protecting consumers by permitting them "to obtain more effective redress if defects substantially impairing the value of a new motor vehicle are not fixed after a reasonable number of attempts." R. Givens, *Practice Commentary* to G.B.L. § 198–a (McKinney 1988) at 311. In saying this, we do not pre-judge the constitutionality of other aspects of that statute under the Commerce Clause, a matter which is also before us in this case.

We note that the Lemon Law also provides for an alternate, state-run dispute resolution procedure, to which a consumer can present any dispute arising under the Lemon Law. G.B.L. § 198–a(k). A manufacturer is obliged to submit to this alternate arbitration when a consumer has made such an application and paid the filing fee. *Id.* Responsibility for promulgating regulations to implement this program is delegated to the New York Attorney General. *Id.* Thus New York has provided for a dispute resolution system that operates entirely under its aegis and over which the state has full authority. *See Chrysler Corp. v. Texas Motor Vehicle Comm'n,* 755 F.2d at 1205–06.

Thus, we sever §§ 198–a(g), (h), and (m) from the remainder of the New York Lem-

on Law, and hold them pre-empted by the Magnuson–Moss Act and regulations promulgated thereunder.

Accordingly, the Attorney General's motion to dismiss is denied and the Plaintiff's *motion for partial summary judgment is granted.*

SO ORDERED.