720 F.Supp. 284 (1989)
MOTOR VEHICLE MANUFACTURERS ASSOCIATION OF UNITED STATES, INC. and Automobile Importers of America, Inc., Plaintiffs,
v.
Robert ABRAMS, Attorney General of the State of New York, Defendant.
No. 86 CIV 9592 (LBS).
United States District Court, S.D. New York.
August 16, 1989.
*285 *286 Hughes Hubbard & Reed (Philip A. Lacovara, William R. Stein, Ross Lipman, of counsel), New York City, for plaintiffs.
Robert Abrams, Atty. Gen., State of N.Y. (John W. Corwin, Jane M. Azia, Mary Hilgeman, Asst. Attys. Gen., of counsel), New York City, for defendant.

OPINION
SAND, District Judge.
Presently before the Court is the one issue that remains in this action: Whether the provision of the New York Lemon Law that effectively requires automobile manufacturers to offer basic warranties of two years or 18,000 miles (whichever comes first) violates the Commerce Clause of the United States Constitution.

BACKGROUND
The plaintiffs, trade associations that represent the interests of domestic car manufacturers and foreign car manufacturers, importers and distributors, instituted this action in December 1986 challenging several provisions of New York General Business Law § 198-a  better known as the Lemon Law  which was enacted in 1983. In two prior opinions, this Court invalidated several provisions of the statute. In May 1988 we held that § 198a(i) violated the First Amendment. 684 F.Supp. 804 (S.D.N.Y.1988). In October 1988 we held §§ 198-a(g), (h) & (m) invalid because they were pre-empted by the Magnuson-Moss Warranty  Federal Trade Commission Improvement Act, 15 U.S.C. §§ 2301 et seq. (1982), and regulations promulgated thereunder. 697 F.Supp. 726 (S.D.N.Y.1988).
*287 The parties agreed to try the remaining issue, concerning the constitutionality of § 198-a(b), based on affidavits and exhibits submitted to the Court, trial briefs and oral argument.[1] Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following findings of fact and conclusions of law.
New York General Business Law § 198-a(b) provides:
If a new motor vehicle does not conform to all express warranties during the first eighteen thousand miles of operation or during the period of two years following the date of original delivery of the motor vehicle to such consumer, whichever is the earlier date, the consumer shall during such period report the nonconformity, defect or condition to the manufacturer, its agent or its authorized dealer. If the notification is received by the manufacturer's agent or authorized dealer, the agent or dealer shall within seven days forward written notice thereof to the manufacturer by certified mail, return receipt requested. The manufacturer, its agent or its authorized dealer shall correct said nonconformity, defect or condition at no charge to the consumer, notwithstanding the fact that such repairs are made after the expiration of such period of operation or such two year period.
N.Y.Gen.Bus.Law § 198-a(b) (McKinney 1988). Only motor vehicles sold and registered in New York are covered by the provision. N.Y.Gen.Bus.Law § 198-a(a)(2) (McKinney 1988).
Plaintiffs claim that this provision, which effectively sets a minimum level of new vehicle warranty protection, violates the Commerce Clause of the United States Constitution, Art. I, § 8, cl. 3. Plaintiffs argue that the New York statute is per se invalid under the Commerce Clause because it regulates conduct outside the state; it opens the door to inconsistent state regulation in an area where uniformity is necessary; and it impermissibly disadvantages consumers in other states. Alternatively, plaintiffs argue that the statute imposes substantial burdens on interstate commerce that are not outweighed by local benefits. See Plaintiffs' Post-Trial Brief at i-ii.

DISCUSSION
Although the Commerce Clause is framed in terms of Congressional power,[2] the Supreme Court "long has recognized that this affirmative grant of authority to Congress also encompasses an implicit or `dormant' limitation on the authority of States to enact legislation affecting interstate commerce." Healy v. Beer Institute, ___ U.S. ___, 109 S.Ct. 2491 n. 1, 105 L.Ed.2d 275 (1989). However, there remains a "residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it." Southern Pacific Co. v. Arizona, 325 U.S. 761, 767, 65 S.Ct. 1515, 1519, 89 L.Ed. 1915 (1945).
The Court has employed a two-part test to analyze whether state legislation unduly interferes with interstate commerce:
When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined *288 whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits. We have also recognized that there is no clear line separating the category of per se invalid under the Commerce Clause, and the category subject to the balancing approach. In either situation the critical consideration is the overall effect of the statute on both local and interstate activity.
Brown-Forman Distillers Corp. v. New York State Liquor Authority, 476 U.S. 573, 579, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986) (citations omitted); see also Healy, 109 S.Ct. at 2499-50 n. 14. We proceed to follow that approach.

A.
The Court's first inquiry concerns whether the statute per se violates the Commerce Clause.
Plaintiffs argue that the statute "results in direct regulation of conduct outside New York" in that "the requirements that dealers give notice and repair the defect are not limited to New York dealers." Plaintiffs' Post-Trial Brief at 22-23. This argument misconstrues the statute somewhat. The statute imposes a free repair obligation on "[t]he manufacturer, its agent or its authorized dealer" (emphasis added), leaving it to the manufacturer to decide how it will repair those covered vehicles that develop problems while outside New York.
Ford, for instance, instituted a plan whereby New York owners must pay the cost of repairs to the out-of-state dealer and then be reimbursed by a New York dealer. See Attorney General's Evidentiary Submission Exhibit [hereinafter "Def. Exh."] FF at F001037. General Motors' plan requires New York owners to pay the cost of the deductible to the out-of-state dealer and then be reimbursed by a New York dealer. See Def. Exh. ZZ. The State apparently considers these plans, which impose no free repair obligation on out-of-state dealers, to be in compliance with the statute. See Transcript of Oral Argument, Apr. 14, 1989 at 46.
The only obligation § 198-a(b) specifically imposes on out-of-state agents or dealers is to forward written notice of reported problems to the manufacturer within seven days. Innocuous as it is, this requirement nonetheless has the effect of "regulat[ing] commerce in other States," Brown-Forman, 476 U.S. at 580, 106 S.Ct. at 2085, in violation of the Commerce Clause. See also Edgar v. MITE Corp., 457 U.S. 624, 642-43, 102 S.Ct. 2629, 2640-41, 73 L.Ed.2d 269 (1982) (plurality opinion) ("The Commerce Clause also precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the state."). This conclusion is reinforced by the fact that New York would lack jurisdiction to enforce the notice requirement against a non-complying out-of-state agent or dealer. As explained in MITE, id. at 643, 102 S.Ct. at 2641:
The limits on a State's power to enact substantive legislation are similar to limits on the jurisdiction of state courts. In either case, "any attempt `directly' to assert extraterritorial jurisdiction over persons or property would offend sister States and exceed the inherent limits of the State's power." Shaffer v. Heitner, 433 U.S. 186, 197, 97 S.Ct. 2569, 2576, 53 L.Ed.2d 683 (1977).
The fact that agents and dealers have contractual relationships with manufacturers that require them to service vehicles according to the manufacturers' warranty policies, see, e.g., Def. Exhs. UU (Chrysler Direct Dealer Agreement) & VV (Ford Sales & Service Agreement), is of no moment. The obligation at issue here stems from the New York statute.
Accordingly, insofar as the Attorney General interprets § 198-a(b) to require that agents or dealers outside New York send manufacturers written notice of owners' complaints, it is per se in violation of the Commerce Clause.[3]
*289 The statute's regulation of manufacturers, agents and dealers who do business in New York does not suffer from this defect. Although attacked by plaintiffs as having effects that reach extraterritorially, § 198-a(b) is readily distinguished from the statutes the Supreme Court has struck down on that ground.
The liquor price control cases involved state statutes that essentially tied prices that distributors could charge in-state to those charged elsewhere. The ultimate flaw in those statutes was the fact that distributors could not change their prices outside the state without violating the statutes. See Brown-Forman, supra (invalidating New York law that required liquor producers selling to wholesalers within state to affirm that prices charged were no higher than lowest price distiller charged wholesalers in any other state during that month); Healy, supra (invalidating Connecticut law that required out-of-state shippers of beer to affirm that their posted prices for products sold to Connecticut wholesalers are, as of the moment of posting, no higher than prices at which those products are sold in neighboring states); see also Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935) (invalidating New York law that regulated milk prices set out-of-state by setting minimum prices for milk purchased from producers and banning resale within state of milk that had been purchased for a lower price).
Neither the warranty provision nor the notice and repair obligation of § 198-a(b) implicates those concerns. Although plaintiffs argue that "higher costs in warranty-regulating states likely would result in national price increases," see Plaintiffs' Letter of June 23, 1989, the record does not support such a conclusion. There is no reason to believe that the few manufacturers affected by § 198-a(b) will not do what logic dictates and continue to pass along the added costs to the consumers who benefit from the statute, namely those who purchase and register their cars in New York. See infra at 12-13. Thus, unlike the price control statutes, it cannot be said that § 198-a(b) has the effect of mandating prices charged outside of New York.
Plaintiffs claim that the problems inherent in the statute will be exacerbated if other states follow New York's lead and implement legislation mandating a minimum level of new vehicle warranty protection. Of course, the Court must consider the potential effect if other states enact such legislation. See Healy, 109 S.Ct. at 2499 ("the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering ... what effect would arise if not one, but many or every State adopted similar legislation"). But we reject plaintiffs' argument about the need for nationwide uniformity in this area.
In support of this argument, plaintiffs cite a body of Supreme Court cases involving the length of trains, e.g., Southern Pacific, supra (Arizona law prohibited the operation of passenger trains longer than fourteen cars and freight trains longer than seventy cars), and the length of trucks, e.g., Raymond Motor Transportation, Inc. v. Rice, 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978) (Wisconsin law prohibited the operation of trucks longer than fifty-five feet or pulling more than one other vehicle without a permit); Kassel v. Consolidated Freightways Corp., 450 U.S. 662, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981) (Iowa law prohibited the operation of sixty-five foot double-trailer trucks). Other than the fact that they all implicate modes of transportation, these cases have little in common with the present action.
The primary concern in Southern Pacific, Raymond Motor and Consolidated *290 Freightways was the fact that the inconsistent legislation at issue literally caused the interstate commerce of goods to come to a halt at states' borders. The state regulations required trains and trucks travelling interstate to stop at the states' borders and unhook cars and trailers. The potential for inconsistent state regulation of new vehicle warranties is simply unrelated to those concerns, as the burden imposed on interstate commerce by the lack of uniformity in this area is minimal. See infra at 291-93.
Furthermore, it was essential to the holdings in those cases that the states' asserted safety rationales were illusory. See, e.g., Southern Pacific, 325 U.S. at 779, 65 S.Ct. at 1525 ("the Arizona Train Limit Law, viewed as a safety measure, affords at most slight and dubious advantage, if any, over unregulated train lengths"); Raymond Motor, 434 U.S. at 447-48, 98 S.Ct. at 797 ("The State of Wisconsin has failed to make even a colorable showing that its regulations contribute to highway safety."); Consolidated Freightways, 450 U.S. at 671-72, 101 S.Ct. at 1317 ("Iowa made a more serious effeort to support the safety rationale of its law than did Wisconsin in Raymond, but its effort was no more persuasive."). As discussed infra at 290-91, we find that New York's rationale for enacting § 198-a(b) was well-founded.

B.
Because the provision at issue does not constitute a per se violation of the Commerce Clause, we must consider whether the state interest outweighs the burden imposed on interstate commerce.[4]See Raymond Motor, 434 U.S. at 441, 98 S.Ct. at 794. The general rule has been stated as follows:
Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.
Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). See also Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 474, 101 S.Ct. 715, 729, 66 L.Ed.2d 659 (1981).
State Interest: By the 1970s widespread consumer dissatisfaction with the quality of new vehicles and repairs led many states to enact lemon laws that gave consumers new forms of protection. The most commonly enacted provisions require manufacturers to replace a vehicle or refund all or part of its purchase price if they are unable to fix defects after a certain number of attempts.
The State of New York enacted the provision at issue here to address the problem of defects that become known shortly after the expiration of new vehicles' warranties, which at the time were typically one year/12,000 miles. See generally Pertschuk, Consumer Automobile Problems, 11 U.C.C. L.J. 145, 151 (1978) (wherein the then-Chairman of the Federal Trade Commission discussed consumer dissatisfaction with automobile warranties and noted that "many design defects arise after the warranty period").
The history of automobile manufacture is replete with examples of cars that develop problems shortly after their warranties expire, and General Motors' THM 200 transmission provides just one example of that phenomenon. After receiving approximately 1600 consumer complaints concerning the transmission in 1979, the New York Attorney General launched an investigation. *291 The court in Abrams v. General Motors Corp., 120 Misc.2d 371, 466 N.Y. S.2d 124, 125-26 (N.Y.Sup.Ct.1983) (emphasis added), summarized the findings:
[The Attorney General's] analysis indicated that, on average, the THM 200 failed to perform properly after 22,000 miles and that in approximately 75% of the cases studies [sic], the THM 200 failed shortly after the expiration of the warranty period. The average cost to repair the transmission after the warranty had expired was $430.00 and there were several instances of repeated failures of a single transmission.... Further investigation revealed that by means of internal reporting procedures, e.g., dealer complaints and claims under the warranty, responsible officers and employees of GM became aware of significant defects in the THM 200.... However, this information was not made known to the public.
The results of other investigations by the Attorney General similarly illustrate how serious defects were often not discovered during the period of the standard one year/12,000 mile basic warranty. See, e.g., Def. Exh. K (complaints of sudden vehicle acceleration in 1981-84 Toyota Cressidas widely distributed over the range between 5,000 and 80,000 miles); Def. Exh. L (greatest frequency of cruise control failure on 1984-88 GM cars occurred at 15,000 miles); Def. Exh. M (sixty percent of power brake booster malfunctions in 1980 Ford Thunderbirds and Mercury Cougars occurred within first two years); Def. Exh. N (over twenty percent of windshield wiper failures involving 1985 GM A-, C-, G-, F- and N-body cars occurred between 12,000 and 18,000 miles).
Given this history, we find that the Lemon Law provision at issue was enacted in a considered attempt to redress significant problems with the automotive industry's warranty practice.
Burden on Interstate Commerce: In the first place, most car manufacturers are not affected by the statute at all. Following "warranty wars" between manufacturers in recent years, the one year/12,000 mile basic warranty is no longer standard in the industry. For the 1989 model year, only Chrysler, Ford, Suzuki, Volvo and Yugo still offer basic warranty coverage less than that required by New York.[5] General Motors, for instance, has increased its basic coverage to three years/50,000 miles and requires a $100 deductible per repair after one year/12,000 miles. J. Gillis, The Car Book 89-90 (1989 ed.).
Following a suit by the Attorney General, see Abrams v. Ford Motor Co., 133 Misc.2d 828, 510 N.Y.S.2d 425 (Sup.Ct. Albany Cty. 1986), modified, 136 A.D.2d 154, 526 N.Y.S.2d 637 (3d Dep't 1988), Ford enacted procedures that apparently bring it into full compliance with the statute. See Affidavit of Thomas M. Sheeran at ¶ 15 and Exhs. B & C (letters from Ford's national General Sales Manager to local dealers outlining the procedures to be followed for cars covered under the statute). Ford now charges New York purchasers an extra $115 for "Mandatory N.Y. Repair Coverage." Id. at ¶ 52; Def. Exh. FF at F001065. Similarly, General Motors charges $65 for "New York Warranty Enhancements." Def. Exh. ZZ.
As in the case of other state-mandated equipment, see, e.g., Def. Exh. Y (Chrysler's charges for mandatory emissions system in California and rear window defogger in New York), manufacturers have simply passed along their added costs to consumers. Correspondence between Ford and its local dealers illustrates that the price charged "reflects the additional costs and complexity associated with the New York Lemon Law provisions." See Affidavit *292 of Thomas M. Sheeran at Exh. B. Indeed, it appears that the $115 charge imposed on New York purchasers includes a profit markup for both the company and its dealers. Id. The Court thus finds that the costs of compliance cannot be said to impact adversely interstate commerce. Compare Hunt v. Washington Apple Advertising Commission, 432 U.S. 333, 338, 97 S.Ct. 2434, 2439, 53 L.Ed.2d 383 (1977) (compliance "costly").
Plaintiffs' argument is further undercut by manufacturers' proven ability to adapt to other state regulations that have had a far greater impact on the manufacture and distribution of cars than the instant statute. For example, all vehicles sold in California must be equipped with a special emissions system, and New York requires all vehicles to be equipped with a rear window defogger or defroster.
The adjustments necessary to comply with those laws  such as reprogramming computers, changing advertising, tracing the ownership of vehicles and even offering distinct warranties  were at least as onerous as those required by the challenged provision here. See Def. Exh. Y (outlining changes made by Chrysler); Def. Exh. Z (Ford); Def. Exh. AA (Toyota); Def. Exh. BB (Honda); Def. Exh. CC (Mitsubishi). The record reflects that manufacturers were able to adapt to those requirements with minimal disruption to their nationwide distribution networks.
Plaintiffs also assert that "[i]f states can impose state-specific substantive warranty requirements, ... it would become impracticable for manufacturers to place warranty information in vehicles prior to shipment to dealers." Plaintiffs' Post-Trial Brief at 31. This claim is frivolous. Not only does Ford currently disclose the contents of § 198-a(b) to purchasers in New York, see Def. Exh. S, but manufacturers have shown little difficulty in disclosing many other state-specific provisions. See, e.g., Def. Exh. T (Ford's lemon law consumers' notification cards for Minnesota, New Mexico, Vermont, Rhode Island, Missouri, Maryland, Illinois, California, Mississippi, Virginia, Pennsylvania, West Virginia and Montana); Def. Exh. U (General Motors); Def. Exh. V (Toyota); Def. Exh. W (Honda).
This attack on the statute is belied further by the fact that the State concedes that the law "imposes no disclosure requirement." Declaration of Assistant Attorney General Jane M. Azia at ¶ 34. But even if manufacturers were required to disclose the length of the New York warranty, the practice in the credit card industry  where interest rates charged in all fifty states are often disclosed  has shown that this is feasible. The burden of disclosure is, in any event, a tolerable by-product of doing business in the national economy.
Hunt v. Washington Apple Advertising Commission, supra, though cited by plaintiffs as "the appropriate analogy," is distinguishable. Unlike § 198-a(b), the North Carolina statute challenged in Hunt "ha[d] the practical effect of not only burdening interstate sales of Washington apples, but also discriminating against them." Id. at 350, 97 S.Ct. at 2445. The Court criticized the statute as eliminating the competitive advantage of Washington apple growers and producing a leveling effect operating to the advantage of local apple growers. Id. at 350-51, 97 S.Ct. at 2445-46. By advantaging in-state businesses over out-of-state ones, the statute created "the very sort of protection against competing out-of-state products that the Commerce Clause was designed to prohibit." Id. at 352, 97 S.Ct. at 2446.
The New York statute does not implicate the concerns raised in Hunt. Because the statute affects all manufacturers equally, it is not protectionist legislation that advantages some manufacturers at the expense of others or favors in-state businesses over out-of-state ones. Cf. Clover Leaf Creamery, 449 U.S. at 471, 101 S.Ct. at 727 (challenged statute "does not effect `simple protectionism,' but `regulates evenhandedly'"). And unlike Hunt, where "the challenged statute [did] remarkably little to further [the] laudable goal" of protecting citizens from deception in the marketing of foodstuffs, 432 U.S. at 353, 97 *293 S.Ct. at 2446, the basis for the New York statute is sound.
Accordingly, the Court finds that the local benefits of § 198-a(b) clearly exceed the burden the statute imposes on interstate commerce. Because the statute's burden is minimal and it does not discriminate against out-of-state interests, there is no need to consider alternatives that might have a lesser impact on interstate commerce.

CONCLUSION
Upon careful consideration of "the overall effect of the statute on both local and interstate activity," Brown-Forman, 476 U.S. at 579, 106 S.Ct. at 2084, the Court concludes that New York General Business Law § 198-a(b) does not violate the Commerce Clause of the United States Constitution except insofar as it is applied to require that out-of-state agents or authorized dealers send manufacturers written notice of owners' complaints. Because the application of the statute that has been invalidated is so clearly a minor part of the general statutory scheme, we hold that the provision at issue and the statute as a whole otherwise remain enforceable. See Motor Vehicles Manufacturers Assoc. v. Abrams, 697 F.Supp. at 743-44. A declaratory judgment consistent with the foregoing shall issue.
SUBMIT ORDER.
NOTES
[1] Although the principle of comity and the desire to avoid unnecessarily deciding constitutional issues suggest that this Court consider "staying its hands," Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 501, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941), we find that it would be inappropriate to abstain from deciding the Commerce Clause issue at this time. It appears to the Court that there are no unsettled questions of state law that would avoid consideration of this issue, and the parties have raised none. In any event, further consideration of the question by New York courts would add significantly to the nearly three years the parties have been waiting for a determination of this important issue, and it appears that the state courts now may be waiting for this Court's decision before proceeding.
[2] "The Congress shall have Power ... To regulate Commerce ... among the several States." U.S. Const. art. I, § 8, cl. 3.
[3] It is unclear why the Attorney General did not follow the dictates of N.Y. Statutes § 149 (McKinney 1971) on this issue:

Generally, the laws of one state can have no force or effect within the territorial limits of another, without the consent of the latter jurisdiction, since each state is an independent sovereignty.... [E]very statute in general terms is construed as having no extraterritorial effect.
Cf. Meyer v. Humaydan, 96 A.D.2d 743, 465 N.Y.S.2d 330 (4th Dep't 1983) (notice requirement of Family Court Act § 516(b) has no extraterritorial effect).
[4] Many of plaintiffs' arguments confuse this limited inquiry into the statute's burden on interstate commerce with the statute's burden on automobile manufacturers generally. See Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 127-28, 98 S.Ct. 2207, 2214-15, 57 L.Ed.2d 91 (1978) (the Commerce Clause "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations").
[5] For reasons entirely independent of the New York statute, Honda, Mitsubishi, Toyota, General Motors and Mazda now offer warranties that provide coverage greater than that required by § 198-a(b). Thus, we give little weight to statements contained in their affidavits concerning the burdens imposed by the statute. Except for the issue of deductibles charged for repairs prior to two years/18,000 miles, there is no longer any live controversy as to these companies, and plaintiffs have not seen fit to supplement their nearly two-year-old affidavits to reflect the present position of these manufacturers.